**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:15-cv-00537 |
| ARIZONA PUBLIC SERVICE COMPANY, | ) | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | ) | |
| EL PASO ELECTRIC COMPANY, PUBLIC | ) | |
| SERVICE COMPANY OF NEW MEXICO, SALT | ) | |
| RIVER PROJECT AGRICULTURAL | ) | |
| IMPROVEMENT AND POWER DISTRICT, and | ) | |
| TUCSON ELECTRIC POWER COMPANY, | ) | |
| Defendants. | | |

| | | |
|---|---|---|
| | ) | |
| DINÉ CITIZENS AGAINST RUINING OUR | ) | |
| ENVIRONMENT, NATIONAL PARKS | ) | |
| CONSERVATION ASSOCIATION, and TO' | ) | |
| NIZHONI ANI, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:11-cv-00889-JB-SCY |
| | ) | |
| v. | ) | |
| | ) | |
| ARIZONA PUBLIC SERVICE COMPANY, | ) | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | ) | |
| EL PASO ELECTRIC COMPANY, PUBLIC | ) | |
| SERVICE COMPANY OF NEW MEXICO, SALT | ) | |
| RIVER PROJECT AGRICULTURAL | ) | |
| IMPROVEMENT AND POWER DISTRICT, and | ) | |
| TUCSON ELECTRIC POWER COMPANY, | ) | |
| Defendants. | | |

**<u>CONSENT DECREE</u>**

- 1 -                                        CONSENT DECREE

## TABLE OF CONTENTS

I. JURISDICTION AND VENUE.................................................................................6

II. APPLICABILITY AND BINDING EFFECT ........................................................7

III. DEFINITIONS......................................................................................................8

IV. NO$_x$ EMISSION REDUCTIONS AND CONTROLS ..........................................17

V. SO$_2$ EMISSION REDUCTIONS AND CONTROLS............................................22

VI. PM EMISSION REDUCTIONS AND CONTROLS............................................28

VII. PROHIBITION ON NETTING CREDITS OR OFFSETS .................................33

VIII. ENVIRONMENTAL MITIGATION PROJECTS.............................................34

IX. CIVIL PENALTY ...............................................................................................37

X. RESOLUTION OF PAST CIVIL CLAIMS.........................................................38

XI. PERIODIC REPORTING ...................................................................................40

XII. REVIEW AND APPROVAL OF SUBMITTALS ..............................................43

XIII. STIPULATED PENALTIES ............................................................................44

XIV. FORCE MAJEURE ..........................................................................................52

XV. AFFIRMATIVE DEFENSES ............................................................................56

XVI. DISPUTE RESOLUTION................................................................................58

XVII. TITLE V PERMIT AND FEDERAL IMPLEMENTATION PLAN REVISIONS...........60

XVIII. INFORMATION COLLECTION AND RETENTION.....................................63

XIX. NOTICES..........................................................................................................64

XX. SALES OR TRANSFERS OF OWNERSHIP INTERESTS................................67

XXI. EFFECTIVE DATE...........................................................................................71

XXII. RETENTION OF JURISDICTION ...................................................................................71

XXIII. MODIFICATION ...............................................................................................................71

XXIV. GENERAL PROVISIONS ..................................................................................................72

XXV. SIGNATORIES AND SERVICE .......................................................................................75

XXVI. PUBLIC NOTICE AND COMMENT................................................................................76

XXVII. TERMINATION ................................................................................................................76

XXVIII. FINAL JUDGMENT.........................................................................................................78

Appendix A: Environmental Mitigation Projects

CONSENT DECREE

WHEREAS, Plaintiff, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), is concurrently filing a Complaint and Consent Decree for injunctive relief and civil penalties pursuant to Sections 113(b)(2) and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413(b)(2) and 7477, alleging that Defendants Arizona Public Service Co. et al. violated the Prevention of Significant Deterioration ("PSD") provisions of Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-7492 and the regulations promulgated thereunder as set forth at 40 C.F.R. § 52.21, and the requirements of Title V of the Act, 42 U.S.C. §§ 7661-7661f;

WHEREAS, on October 4, 2011, Plaintiffs, Diné Citizens Against Ruining Our Environment, To' Nizhoni Ani, and National Parks Conservation Association (the "Groups") filed a Complaint and on January 6, 2012 filed a First Amended Complaint for civil penalties, declaratory and injunctive relief, with costs and fees, under the Act, 42 U.S.C. §§ 7401, *et seq.*, and specifically the Act's citizen suit provision, 42 U.S.C. § 7604, against Defendants Arizona Public Service Co. et al., *Diné Citizens Against Ruining Our Environment et al. v. Arizona Public Service Co. et al.*, No. 1:11-cv-00889-BB-KBM (D.N.M.) (the United States' Complaint and the Groups' Complaint and First Amended Complaint are hereinafter collectively referred to as the "Complaints");

WHEREAS, in their Complaints, the United States and the Groups (collectively, the "Plaintiffs") allege, *inter alia,* that Defendants made major modifications to major emitting facilities, and failed to obtain the necessary permits and install and operate the controls necessary under the Act to reduce sulfur dioxide ("$SO_2$"), nitrogen oxides ("$NO_x$"), and particulate matter ("PM") at their facility known as the Four Corners Power Plant ("FCPP") located on the Navajo

CONSENT DECREE

Nation near Shiprock, New Mexico, and that such emissions damage human health and the environment;

WHEREAS, in the Complaints, the Plaintiffs allege claims upon which, if proven, relief can be granted against Defendants under Sections 113, 167, and 304 of the Act, 42 U.S.C. §§ 7413, 7477, and 7604;

WHEREAS, after the Defendants' activities at FCPP that are the subject of the Complaints and before the Plaintiffs and Defendants (collectively, the "Parties") consented to entry of this Consent Decree, Defendant Southern California Edison Company ("SCE") sold and transferred to Defendant Arizona Public Service Company ("APS"), and APS acquired from SCE, all of SCE's Ownership Interest in FCPP, and SCE no longer participates in the ownership or operation of FCPP;

WHEREAS, the Plaintiffs and Defendants have agreed that settlement of this action is in the best interest of the Parties and in the public interest, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter;

WHEREAS, the Parties anticipate that the installation and operation of pollution control equipment and practices pursuant to this Consent Decree will achieve significant reductions of $SO_2$, $NO_x$, and PM emissions and improve air quality;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated in good faith and at arm's length and that this Consent Decree is fair, reasonable, consistent with the goals of the Act, and in the public interest;

WHEREAS, Defendants have cooperated in the resolution of this matter;

- 5 -                                                        CONSENT DECREE

WHEREAS, Defendants have denied and continue to deny the violations alleged in the Complaints, maintain that they have been and remain in compliance with the Act and are not liable for civil penalties or injunctive relief, and state that they are agreeing to the obligations imposed by this Consent Decree solely to avoid the costs and uncertainties of litigation and to improve the environment; and

WHEREAS, the Parties have consented to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this action and over the Parties pursuant to Sections 113(b) and 304(c) of the Act, 42 U.S.C. §§ 7413(b) and 7604(c), and 28 U.S.C. §§ 1331, 1345, 1355, and 1367. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c), and 1395, and 42 U.S.C. §§ 7413(b) and 7604(c). Solely for the purposes of this Consent Decree and the Complaints, and for no other purpose, Defendants waive all objections and defenses that they may have to the Court's jurisdiction over this action, to the Court's jurisdiction over Defendants, and to venue in this district. Defendants consent to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. Notwithstanding the foregoing, should this Consent Decree not be entered by this Court, then the waivers and consents set forth in this Section I (Jurisdiction and Venue) shall be null and void and of no effect.

CONSENT DECREE

2.      Except as expressly provided for herein, this Consent Decree shall not create any rights in or obligations of any party other than the Parties to this Consent Decree.  Except as provided in Section XXVI (Public Notice and Comment) of this Consent Decree, the Parties consent to entry of this Consent Decree without further notice.

## II.  APPLICABILITY AND BINDING EFFECT

3.      Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the United States, and upon the Groups and the Defendants and any successors, assigns, or other entities or persons otherwise bound by law.

4.      Notwithstanding any other provision of this Consent Decree, SCE, as a former co-owner of FCPP that has sold and transferred to APS all of its Ownership Interest in FCPP, shall have no obligations or liabilities under this Consent Decree, either jointly or severally, except for the obligations and liabilities applicable to such transferred Ownership Interest that are set forth in Section VIII (Environmental Mitigation Projects), Section IX (Civil Penalty), and the other sections of this Consent Decree to the extent that they directly relate to Section VIII or Section IX.  All other obligations and liabilities under this Consent Decree applicable to such transferred Ownership Interest shall be the obligations and liabilities of APS, and SCE shall have no liability therefor.  Without limiting the foregoing, and for the avoidance of doubt, SCE shall have no obligations or liability under Section IV ($NO_x$ Emission Reductions and Controls), Section V ($SO_2$ Emission Reductions and Controls), or Section VI (PM Emission Reductions and Controls, or any other sections of this Consent Decree to the extent they relate to Section IV, Section V, or Section VI.  Entry of this Consent Decree resolves all claims as provided in Section X

CONSENT DECREE

(Resolution of Past Civil Claims) against all of the Defendants, including without limitation, SCE.

5.        Owner Defendants or Defendants, as the case may be, shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other companies or organizations retained after entry of this Consent Decree to perform any of the work required by this Consent Decree.  Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, Owner Defendants or Defendants, as the case may be, shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.  In any action to enforce this Consent Decree, Owner Defendants or Defendants, as the case may be, shall not assert as a defense the failure of their officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless Owner Defendants or Defendants, as the case may be, establish that such failure resulted from a Force Majeure Event, as defined in Section XIV (Force Majeure) of this Consent Decree.

## III.  DEFINITIONS

6.        Every term expressly defined by this Section III shall have the meaning given that term herein.  Every other term used in this Consent Decree that is also a term used under the Act or in a federal regulation implementing the Act shall mean in this Consent Decree what such term means under the Act or those regulations.

7.        A "30-Day Rolling Average $NO_x$ Emission Rate" for a Unit shall be expressed in lb/mmBtu and calculated in accordance with the following procedure: first, sum the total pounds of $NO_x$ emitted from the Unit during the current Unit Operating Day and the previous twenty-

nine (29) Unit Operating Days; second, sum the total heat input to the Unit in mmBtu during the current Unit Operating Day and the previous twenty-nine (29) Unit Operating Days; and third, divide the total number of pounds of $NO_x$ emitted during the thirty (30) Unit Operating Days by the total heat input during the thirty (30) Unit Operating Days. A new 30-Day Rolling Average $NO_x$ Emission Rate shall be calculated for each new Unit Operating Day.  Each 30-Day Rolling Average $NO_x$ Emission Rate shall include all emissions that occur during all periods within any Unit Operating Day, including emissions from startup, shutdown, and Malfunction, except as otherwise provided by Section XIV (Force Majeure).

8.      A "30-Day Rolling Average $SO_2$ Removal Efficiency" means the percent reduction in the mass of $SO_2$ achieved by a Unit's FGD system over a thirty (30) Unit Operating Day period and shall be calculated as follows: step one, sum the total pounds of $SO_2$ emitted as measured at the outlet of the FGD system for the Unit during the current Unit Operating Day and the previous twenty-nine (29) Unit Operating Days as measured at the outlet of the FGD system for that Unit; step two, sum the total pounds of $SO_2$ delivered to the inlet of the FGD system for the Unit during the current Unit Operating Day and the previous twenty-nine (29) Unit Operating Days as measured at the inlet to the FGD system for that Unit (this shall be calculated by measuring the ratio of the lb/mmBtu $SO_2$ inlet to the lb/mmBtu $SO_2$ outlet and multiplying the outlet pounds of $SO_2$ by that ratio); step three, subtract the outlet $SO_2$ emissions calculated in step one from the inlet $SO_2$ emissions calculated in step two; step four, divide the remainder calculated in step three by the inlet $SO_2$ emissions calculated in step two; and step five, multiply the quotient calculated in step four by 100 to express as a percentage of removal efficiency. A new 30-Day Rolling Average $SO_2$ Removal Efficiency shall be calculated for each new Unit

Operating Day, and shall include all emissions that occur during all periods within each Unit Operating Day, including emissions from startup, shutdown, and Malfunction, except as otherwise provided by Section XIV (Force Majeure).

9.　　　　"Annual Tonnage Limitation" means the limitation on the number of tons of the pollutant in question that may be emitted from FCPP during the relevant calendar year (*i.e.*, January 1 through December 31), and shall include all emissions of the pollutant emitted during periods of startup, shutdown and Malfunction.

10.　　　　"Baghouse" means a full stream (fabric filter) particulate emissions control device.

11.　　　　"CEMS" and "Continuous Emission Monitoring System," mean, for obligations involving the monitoring of $NO_x$ and $SO_2$ emissions under this Consent Decree, the devices defined in 40 C.F.R. § 72.2, and the $SO_2$ monitors required by this Decree for determining compliance with the 30-Day Rolling Average $SO_2$ Removal Efficiency requirement set forth in Paragraphs 61 and 62.

12.　　　　"Clean Air Act" and "the Act" mean the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, and its implementing regulations.

13.　　　　"Consent Decree" and "Decree" mean this Consent Decree and the Appendix hereto, which is incorporated into the Consent Decree.

14.　　　　"Continuous Operation," "Continuously Operate," and "Continuously Operating" mean that when a pollution control technology or combustion control is required to be used at a Unit pursuant to this Consent Decree (including, but not limited to, SCR, FGD, or Baghouse), it shall be operated at all times such Unit is in operation (except as otherwise provided by Section

　　　　CONSENT DECREE

XIV (Force Majeure)), consistent with the technological limitations, manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 C.F.R. § 60.11(d)) for such equipment and the Unit.

15.         "Date of Entry" means the date this Consent Decree is signed or otherwise approved in writing by the District Court Judge for the United States District Court for the District of New Mexico.

16.         "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of New Mexico.

17.         "Day" means calendar day unless otherwise specified in this Consent Decree.

18.         "Defendant" means any one of the Defendants, as that term is defined herein and subject to the proviso in that definition.

19.         "Defendants" means Arizona Public Service Company, El Paso Electric Company, Public Service Company of New Mexico, Salt River Project Agricultural Improvement and Power District, Tucson Electric Power Company, and Southern California Edison Company; provided, however, that Southern California Edison Company shall have no obligations or liability under this Consent Decree, either jointly or severally, except as provided in Section II (Applicability and Binding Effect), and the terms Defendant and Defendants wherever used in this Consent Decree shall refer to or include Southern California Edison Company only if and to the extent consistent with Section II.

20.     "Emission Rate" means, for a given pollutant, the number of pounds of that pollutant emitted per million British thermal units of heat input ("lb/mmBtu"), measured in accordance with this Consent Decree.

21.     "EPA" means the United States Environmental Protection Agency.

22.     "FCPP" means the Four Corners Power Plant, consisting of five coal-fired units and related equipment (designated as Unit 1, Unit 2, Unit 3, Unit 4, and Unit 5) with a combined electricity generating capacity of 2,070 megawatts, which is located near Farmington, New Mexico.  Units 1, 2, and 3 are owned by APS, and were shut down effective December 30, 2013.  Units 4 and 5 were previously owned jointly by all of the Defendants and are now owned jointly by Owner Defendants.

23.     "Flue Gas Desulfurization System" and "FGD" mean a pollution control device that employs flue gas desulfurization technology, including an absorber utilizing lime slurry, for the reduction of $SO_2$ emissions.

24.     "Fossil Fuel" means any hydrocarbon fuel, including coal, petroleum coke, petroleum oil, or natural gas.

25.     "lb/mmBtu" means one pound of a pollutant per million British thermal units of heat input.

26.     "Make-Right Vendor Guarantee" means, for an SCR, a guarantee offered by an SCR vendor that covers the SCR, including the catalyst, ammonia injection system, and support structure, under operating conditions (excluding any Malfunctions) above minimum operating temperature for the SCR, the achievement of which is demonstrated solely during two performance tests:  one performance test no later than 90 Days after initial operation of the SCR,

- 12 -                                                   CONSENT DECREE

and one performance test after no fewer than 16,000 hours of SCR operation, but no later than December 31, 2020 regardless of the number of operating hours achieved.  If the SCR does not meet the guarantee in one of these two performance tests, a Make-Right Vendor Guarantee requires the SCR vendor to repair, replace, or correct the SCR to meet the specified guaranteed Emission Rate, which is demonstrated by successful achievement of a performance test.

27.     "Malfunction" means any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

28.     "Navajo Nation" means the federally recognized Indian Tribe of the Navajo Nation in Arizona, Utah, and New Mexico.  See 75 Fed. Reg. 60810, 60812 (October 1, 2010).

29.     "NNEPA" means the Navajo Nation Environmental Protection Agency.

30.     "Nonattainment New Source Review" and "Nonattainment NSR" mean the nonattainment area New Source Review ("NSR") program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and 40 C.F.R. Part 51.

31.     "Netting" means the process of determining whether a particular physical change or change in the method of operation of a major stationary source results in a net emissions increase, as that term is defined at 40 C.F.R. § 52.21(b)(3).

32.     "New Source Performance Standards" and "NSPS" mean the standards of performance for new stationary sources  air quality program under Part A of Subchapter I of the Clean Air Act, 42 U.S.C. § 7411 and 40 C.F.R. Part 60.

33.     "NOₓ" means oxides of nitrogen, measured in accordance with the provisions of this Consent Decree.

34.     "NOₓ Allowance" means an authorization or credit to emit a specified amount of NOₓ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or an applicable implementation plan. Although no NOₓ Allowance program is applicable to FCPP as of the Date of Lodging, the Parties acknowledge that this definition of "NOₓ Allowance" includes authorizations or credits that may be allocated or issued under emissions trading or marketable permit programs that may become applicable to FCPP in the future.

35.     "Operating Day" means any Day on which a Unit fires Fossil Fuel.

36.     "Owner Defendants" means those Defendants holding an Ownership Interest in FCPP as of the Date of Entry of this Consent Decree, namely all Defendants except Southern California Edison Company.

37.     "Ownership Interest" means part or all of Defendants' legal or equitable ownership interest in FCPP.

38.     "Parties" means Plaintiff the United States of America, the Plaintiff Groups, and the Defendants.

39.     "Party" means one of the named Parties.

40.     "PM" means total filterable particulate matter, measured in accordance with the provisions of this Consent Decree.

41.     "PM CEMS" and "PM Continuous Emission Monitoring System" mean, for obligations involving the monitoring of PM emissions under this Consent Decree, the equipment

CONSENT DECREE

that samples, analyzes, measures, and provides, by readings taken at frequent intervals, an electronic and/or paper record of PM emissions.

42.     "Prevention of Significant Deterioration" and "PSD" mean the prevention of significant deterioration of air quality program under Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 - 7492, and 40 C.F.R. § 52.21.

43.     "Project Dollars" means Defendants' expenditures and payments incurred or made in carrying out the environmental projects identified in Section VIII (Environmental Mitigation Projects) of this Consent Decree to the extent that such expenditures or payments both: (a) comply with the requirements set forth in Section VIII (Environmental Mitigation Projects) and Appendix A of this Consent Decree, and (b) constitute (i) Defendants' direct payments for such projects, or (ii) Defendants' external costs for contractors, vendors, and equipment.

44.     "Removal Efficiency" means, for a given pollutant, the percentage of that pollutant removed by the applicable emission control device, measured in accordance with the provisions of this Consent Decree.

45.     "Selective Catalytic Reduction" and "SCR" mean a pollution control device that destroys $NO_x$ by injecting a reducing agent (*e.g.*, ammonia) into the flue gas that, in the presence of a catalyst (*e.g.*, vanadium, titanium, or zeolite), converts $NO_x$ into molecular nitrogen and water.

46.     "$SO_2$" means sulfur dioxide, measured in accordance with the provisions of this Consent Decree.

CONSENT DECREE

47.       "$SO_2$ Allowance" means an authorization to emit a specified amount of $SO_2$ that is allocated or issued under an emissions trading or marketable permit program of any kind established under the Clean Air Act or an applicable implementation plan, including as defined at 42 U.S.C. § 7651a(3).

48.       "Surrender" means to permanently surrender $SO_2$ Allowances so that such $SO_2$ Allowances can never be used to meet any compliance requirement under the Clean Air Act or this Consent Decree.

49.       "Title V Permit" means the permit required for FCPP under Subchapter V of the Act, 42 U.S.C. §§ 7661-7661e.

50.       "Unit" means, solely for purposes of this Consent Decree, collectively, the coal pulverizer, stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment, at or serving a coal-fired steam electric generating unit at FCPP.

51.       "Wet Stack" means a stack designed to be capable of use with a saturated gas stream constructed with liner material(s) consisting of one or more of the following: carbon steel with a protective lining (organic resin, fluoroelastomers, borosilicate glass blocks or a thin cladding of a corrosion-resistant alloy), fiberglass-reinforced plastic, solid corrosion-resistant alloy, or acid-resistant brick and mortar.

       CONSENT DECREE

## IV.  NOx EMISSION REDUCTIONS AND CONTROLS

### A.    NOx Emission Limitations and Control Requirements

#### 1)  Selective Catalytic Reduction at FCPP Units 4 and 5

52.      Owner Defendants shall install and commence Continuous Operation of an SCR on either FCPP Unit 4 or FCPP Unit 5 by no later than March 31, 2018.  Commencing no later than 30 Operating Days thereafter, Owner Defendants shall Continuously Operate the SCR installed on the Unit selected pursuant to this Paragraph 52 so as to achieve and maintain a 30-Day Rolling Average NOx Emission Rate of no greater than 0.080 lb/mmBtu, subject to the petition process in Paragraph 54.

53.      Owner Defendants shall install and commence Continuous Operation of an SCR on the FCPP Unit not selected pursuant to Paragraph 52 by no later than July 31, 2018. Commencing no later than 30 Operating Days thereafter, Owner Defendants shall Continuously Operate the SCR installed on such Unit so as to achieve and maintain a 30-Day Rolling Average NOx Emission Rate of no greater than 0.080 lb/mmBtu, subject to the petition process in Paragraph 54.

54.      At any time after March 31, 2019 but before December 31, 2020, Owner Defendants may submit to EPA and the Groups a petition for a proposed revision to the 30-Day Rolling Average NOx Emission Rate of 0.080 lb/mmBtu for either or both of the FCPP Units. The petition must demonstrate all of the following:

(a)     That the design of the SCR system met the following parameters:

CONSENT DECREE

(i)  The SCR system was designed to meet a $NO_x$ emission rate of 0.049 lb/mmBtu, on an hourly average basis, under normal operating conditions once the minimum operating temperature of the SCR catalyst is achieved; and

(ii) Owner Defendants obtained a Make-Right Vendor Guarantee for a $NO_x$ emission rate of 0.049 lb/mmBtu;

(b)     That best efforts have been taken to achieve the 30-Day Rolling Average $NO_x$ Emission Rate of 0.080 lb/mmBtu.  Best efforts includes but is not limited to exhausting the Make-Right Vendor Guarantee and obtaining independent outside support from a registered professional engineer expert in SCR design.  To demonstrate best efforts have been taken, the petition shall also include:

(i) the request for bid for the subject SCR;

(ii) winning bid documents, including all warranties and design information;

(iii) $NO_x$, $NH_3$, and heat rate CEMS data and all related stack tests;

(iv) daily coal quality data, including sulfur, ash, and heat content;

(v) operating and maintenance logs documenting all exceedances of the 0.080 lb/mmBtu 30-Day Rolling Average $NO_x$ Emission Rate and measures taken to correct them;

(vi) vendor certification pursuant to a Make-Right Vendor Guarantee that the 0.080 lb/mmBtu 30-Day Rolling Average $NO_x$ Emission Rate cannot be met by the SCR as designed;

CONSENT DECREE

(vii) a signed and sealed report by a registered professional engineer expert in SCR design confirming the 0.080 lb/mmBtu 30-Day Rolling Average $NO_x$ Emission Rate cannot be met by the SCR as designed; and

(viii) affidavits documenting causes of failure to meet the 0.080 lb/mmBtu 30-Day Rolling Average $NO_x$ Emission Rate, signed and sealed by a licensed professional engineer;

(c)      That the SCR system was properly operated and maintained pursuant to the manufacturer's specifications for achieving and Continuously Operating to meet the design $NO_x$ emission rate of 0.049 lb/mmBtu; and

(d)      That the Owner Defendant Continuously Operated the SCR and maximized the percent of flue gas or water bypassed around the economizer during any startup and shutdown events in a manner to attain minimum operating temperature as quickly as reasonably possible during startup and to maintain minimum operating temperature during shutdowns as long as reasonably possible;

(e)      That the Owner Defendant Continuously Operated the SCR and controlled the percent of flue gas or water bypassed around the economizer to maintain minimum operating temperature during load changes.

55.      In any petition submitted pursuant to Paragraph 54, Owner Defendants shall include an alternate 30-Day Rolling Average $NO_x$ Emission Rate, but in no event may Owner Defendants propose a 30-Day Rolling Average $NO_x$ Emission Rate more than 0.085 lb/mmBtu. Owner Defendants shall also submit all studies, reports, and/or recommendations from the vendor and contractor(s) required by this Paragraph and Paragraph 54, evaluating each measure

      CONSENT DECREE

undertaken in an effort to meet a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.080 lb/mmBtu.  Owner Defendants shall also deliver with each submission all pertinent documents and data that support or were considered in preparing such submission, as well as all data pertaining to the performance of the SCR in question since the Date of Entry of the Consent Decree and the operational history of the Unit since the Date of Entry of the Consent Decree.  If EPA disapproves the proposed revision to the 30-Day Rolling Average NO$_x$ Emission Rate, which disapproval shall be based on the requirements in Paragraph 54, such disagreement is subject to Section XVI (Dispute Resolution).  Provided that Owner Defendants are in compliance with a 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.085 lb/mmBtu, Owner Defendants shall not be subject to stipulated penalties pursuant to Section XIII (Stipulated Penalties) for exceeding the 30-Day Rolling Average NO$_x$ Emission Rate required by Paragraphs 52 and 53 until EPA issues a formal written summary of its position regarding any dispute pursuant to Paragraph 144.  If EPA's formal written response pursuant to Paragraph 144 disapproves Owner Defendants' proposed revision of the 30-Day Rolling Average NO$_x$ Emission Rate, then Owner Defendants shall be subject to stipulated penalties pursuant to Section XIII (Stipulated Penalties) for any violation of the 30-Day Rolling Average NO$_x$ Emission Rate of no greater than 0.080 lb/mmBtu from the date of disapproval forward.

### 2) Annual NO$_x$ Tonnage Limitations for FCPP

56.	In addition to meeting the emissions rates set forth in Paragraphs 52 and 53, all Units at FCPP, collectively, shall not emit NO$_x$ in excess of the Annual Tonnage Limitations in Table 1; provided, however, if the 30-Day Rolling Average NO$_x$ Emission Rate of 0.080 lb/mmBtu required under Paragraphs 52 and 53 is revised pursuant to the petition process set

CONSENT DECREE

forth in Paragraphs 54 and 55, the annual $NO_x$ tonnage limitations set forth in Table 1 shall

increase by the ratio of the new $NO_x$ rate in lb/mmBtu determined pursuant to Paragraphs 54 and

55 divided by 0.080 lb/mmBtu.

 Table 1:

| Applicable Calendar Year | Annual FCPP Tonnage Limitation for $NO_x$ (Tons Per Year) |
|---|---|
| 2014 | 31,060 |
| 2015 | 31,060 |
| 2016 | 31,060 |
| 2017 | 31,060 |
| 2018 | 12,165 |
| 2019 and each year thereafter | 4,968 |

### B.   Monitoring of $NO_x$ Emissions

57.         In determining the 30-Day Rolling Average $NO_x$ Emission Rate, Owner

Defendants shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that

$NO_x$ emissions data for the 30-Day Rolling Average $NO_x$ Emission Rate need not be bias

adjusted and the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply.

Diluent capping (*i.e.*, 5% $CO_2$) will be applied to the $NO_x$ emission calculation for any hours

where the measured $CO_2$ concentration is less than 5% following the procedures in 40 C.F.R.

Part 75, Appendix F, Section 3.3.4.1.  Owner Defendants shall include in each semiannual report

submitted pursuant to Section XI of this Consent Decree all hours where diluent capping

procedures were applied during the reporting period.

- 21 -                    CONSENT DECREE

58.        For purposes of determining compliance with the Annual Tonnage Limitations in Table 1, Owner Defendants shall use CEMS in accordance with the procedures specified in 40 C.F.R. Part 75.

### C.        Use of NO$_x$ Allowances

59.        Owner Defendants shall not sell, trade, or transfer any surplus NO$_x$ Allowances allocated to FCPP that would otherwise be available for sale or trade as a result of the actions taken by Owner Defendants to comply with the requirements of this Consent Decree.

## V.  SO$_2$ EMISSION REDUCTIONS AND CONTROLS

### A.        SO$_2$ Emission Limitations and Control Requirements

#### 1)        Flue Gas Desulfurization at FCPP Units 4 and 5

60.        Beginning on the Date of Entry of this Consent Decree, Owner Defendants shall Continuously Operate the existing FGDs at FCPP Unit 4 and Unit 5 so as to emit SO$_2$ from FCPP at an amount no greater than 10.0% of the potential combustion concentration assuming all of the sulfur in the coal is converted to SO$_2$.  Compliance with this emissions standard shall be determined on a rolling 365-Operating Day basis using the applicable methodologies set forth in 40 C.F.R. § 49.5512(e)(2) (2012).  The first day for determining compliance with this emissions standard shall be 365 Days after the Date of Entry of this Consent Decree.  The requirements of this Paragraph 60 shall remain in effect until Owner Defendants achieve compliance with the requirements set forth in Paragraphs 61 and 62.

61.        By no later than March 31, 2018, Owner Defendants shall convert the existing ductwork and stack at either FCPP Unit 4 or FCPP Unit 5 to a Wet Stack, so as to eliminate the need to bypass flue gas around the FGD absorbers for reheat purposes.  Commencing no later

than 30 Operating Days thereafter, Owner Defendants shall Continuously Operate the existing FGD at the FCPP Unit selected pursuant to this Paragraph 61 so as to achieve and maintain a 30-Day Rolling Average $SO_2$ Removal Efficiency of at least 95.0%.

62.	By no later than July 31, 2018, Owner Defendants shall convert the existing ductwork and stack at the FCPP Unit not selected pursuant to Paragraph 61 to a Wet Stack, so as to eliminate the need to bypass flue gas around the FGD absorbers for reheat purposes. Commencing no later than 30 Operating Days thereafter, Owner Defendants shall Continuously Operate the existing FGD at such Unit so as to achieve and maintain a 30-Day Rolling Average $SO_2$ Removal Efficiency of at least 95.0%.

## 2) Annual $SO_2$ Tonnage Limitations for FCPP

63.	In addition to meeting the emissions rates set forth in Paragraphs 60, 61, and 62, all Units at FCPP, collectively, shall not emit $SO_2$ in excess of the Annual Tonnage Limitations in Table 2.

 Table 2:

| Applicable Calendar Year | Annual FCPP Tonnage Limitation for $SO_2$ (Tons Per Year) |
|---|---|
| 2014 | 13,300 |
| 2015 | 13,300 |
| 2016 | 13,300 |
| 2017 | 13,300 |
| 2018 | 8,300 |
| 2019 and each year thereafter | 6,800 |

CONSENT DECREE

## B. Additional Monitoring of SO₂ Emissions

64.     By each of the dates by which Owner Defendants must comply with the 30-Day Rolling Average SO$_2$ Removal Efficiency required under Paragraphs 61 and 62, Owner Defendants shall install, certify, maintain, and operate FGD inlet SO$_2$ and any associated diluent CEMS with respect to that Unit in accordance with the requirements of 40 C.F.R. § 49.5512(e)(1).

65.     In determining the 30-Day Rolling Average SO$_2$ Removal Efficiency, Owner Defendants shall use CEMS in accordance with the procedures of 40 C.F.R. Part 75, except that SO$_2$ emissions data for the 30-Day Rolling Average SO$_2$ Removal Efficiency need not be bias adjusted and the missing data substitution procedures of 40 C.F.R. Part 75 shall not apply. Diluent capping (*i.e.*, 5% CO$_2$) will be applied to the SO$_2$ emission calculation for any hours where the measured CO$_2$ concentration is less than 5% following the procedures in 40 C.F.R. Part 75, Appendix F, Section 3.3.4.1. Owner Defendants shall include in each semiannual report submitted pursuant to Section XI of this Consent Decree all hours where diluent capping procedures were applied during the reporting period.

66.     For purposes of determining compliance with the Annual Tonnage Limitations in Table 2, Owner Defendants shall use CEMS in accordance with the procedures specified in 40 C.F.R. Part 75.

## C. Use and Surrender of SO₂ Allowances

67.     Except as may be required to comply with Section XIII (Stipulated Penalties), Owner Defendants shall not use SO$_2$ Allowances to comply with any requirement of this Consent Decree, including by claiming compliance with any emission limitation required by this Consent

CONSENT DECREE

Decree by using, tendering, or otherwise applying $SO_2$ Allowances to offset any excess emissions.

68.     Except as provided in this Consent Decree, Owner Defendants shall not sell, bank, trade, or transfer any $SO_2$ Allowances allocated to FCPP.

69.     Beginning with calendar year 2015, and continuing each calendar year thereafter, Owner Defendants shall Surrender to EPA, or transfer to a non-profit third party selected by Owner Defendants for Surrender, all $SO_2$ Allowances allocated to FCPP for that calendar year that Owner Defendants do not need in order to meet their own federal and/or state Clean Air Act statutory or regulatory requirements for the FCPP Units.

70.     Nothing in this Consent Decree shall prevent Owner Defendants from purchasing or otherwise obtaining $SO_2$ Allowances from another source for purposes of complying with Clean Air Act requirements to the extent otherwise allowed by law.

71.     The requirements of this Consent Decree pertaining to Owner Defendants' use and surrender of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Decree.

**D.     Super-Compliant $SO_2$ Allowances**

72.     For any given calendar year, provided that FCPP is in compliance for that calendar year with all emissions limitations for $SO_2$ set forth in (i) this Consent Decree and (ii) the "Federal Implementation Plan Provisions for Four Corners Power Plant, Navajo Nation" (40 C.F.R. § 49.5512), nothing in this Consent Decree, including the provisions of Paragraphs 68 and 69 pertaining to the use and Surrender of $SO_2$ Allowances, shall preclude Owner Defendants

from selling, trading, or transferring $SO_2$ Allowances allocated to FCPP that become available

for sale or trade that calendar year solely as a result of:

    a.    the installation and operation of any pollution control technology or technique at Unit 4 or Unit 5 that is not otherwise required by this Consent Decree; or

    b.    achievement and maintenance of a 30-Day Rolling Average $SO_2$ Removal Efficiency at Unit 4 or Unit 5 at a higher removal efficiency than the 30-Day Rolling Average $SO_2$ Removal Efficiency required by Section V of this Consent Decree;

so long as Owner Defendants timely report the generation of such surplus $SO_2$ Allowances that

occur after the Date of Entry of this Consent Decree in accordance with Section XI (Periodic

Reporting) of this Consent Decree.

        **E.**    **Method for Surrender of $SO_2$ Allowances**

73.    Owner Defendants shall Surrender, or transfer to a non-profit third party selected

by Owner Defendants for Surrender, all $SO_2$ Allowances required to be Surrendered pursuant to

Paragraph 69 by April 30 of the immediately following calendar year.  Surrender need not

include the specific $SO_2$ Allowances that were allocated to FCPP, so long as Owner Defendants

surrender $SO_2$ Allowances that are from the same year and that are equal to the number required

to be surrendered under this Paragraph 73.

74.    If any $SO_2$ Allowances are transferred directly to a non-profit third party, Owner

Defendants shall include a description of such transfer in the next report submitted to EPA

pursuant to Section XI (Periodic Reporting) of this Consent Decree.  Such report shall: (i)

provide the identity of the non-profit third-party recipient(s) of the $SO_2$ Allowances and a listing

of the serial numbers of the transferred $SO_2$ Allowances; and (ii) include a certification by the third-party recipient(s) pursuant to Paragraph 112 stating that the recipient(s) will not sell, trade, or otherwise exchange any of the allowances and will not use any of the $SO_2$ Allowances to meet any obligation imposed by any environmental law. No later than the third periodic report due after the transfer of any $SO_2$ Allowances, Owner Defendants shall include a statement that the third-party recipient(s) Surrendered the $SO_2$ Allowances for permanent surrender to EPA in accordance with the provisions of Paragraph 75 within one (1) year after Owner Defendants transferred the $SO_2$ Allowances to them. Owner Defendants shall not have complied with the $SO_2$ Allowance Surrender requirements of this Paragraph 74 until all third-party recipient(s) shall have actually Surrendered the transferred $SO_2$ Allowances to EPA.

75.　　　　For all $SO_2$ Allowances surrendered to EPA, Owner Defendants or the third-party recipient(s) (as the case may be) shall first submit an $SO_2$ Allowance transfer request form to the EPA Office of Air and Radiation's Clean Air Markets Division directing the transfer of such $SO_2$ Allowances to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct in writing. Such $SO_2$ Allowance transfer requests may be made in an electronic manner using the EPA's Clean Air Markets Division Business System or similar system provided by EPA. As part of submitting these transfer requests, Owner Defendants or the third-party recipient(s) shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify -- by name of account and any applicable serial or other identification numbers or station names -- the source and location of the $SO_2$ Allowances being surrendered.

　　　　　　　　CONSENT DECREE

## VI.  PM EMISSION REDUCTIONS AND CONTROLS

     A.     **PM Emission Reduction Requirements**

76.       Beginning on the Date of Entry of this Consent Decree, and continuing thereafter, Owner Defendants shall operate each FCPP Unit in a manner consistent with good air pollution control practice for minimizing PM emissions, as set forth in 40 C.F.R. § 49.5512(g) (2012).  In addition, with respect to FCPP Units 4 and 5, Owner Defendants shall, at a minimum, to the extent practicable: (a) operate each compartment of the Baghouse for each Unit (except the compartment provided as a spare compartment under the design of the baghouse), regardless of whether those actions are needed to comply with opacity limits; (b) repair any failed Baghouse compartment at the next planned Unit outage (or unplanned outage of sufficient length); (c) maintain and replace bags on each Baghouse as needed to achieve the required collection efficiency; (d) inspect for and repair during the next planned Unit outage (or unplanned outage of sufficient length) any openings in Baghouse casings, ductwork, and expansion joints to minimize air leakage; and (e) ensure that a bag leak detection program is developed and implemented to detect leaks and promptly repair any identified leaks.

77.       Beginning on the Date of Entry of this Consent Decree, and continuing thereafter, Owner Defendants shall Continuously Operate a Baghouse at FCPP Unit 4 so as to achieve and maintain a filterable PM Emission Rate no greater than 0.0150 lb/mmBtu.

78.       Beginning the Date of Entry of this Consent Decree, and continuing thereafter, Owner Defendants shall Continuously Operate a Baghouse at FCPP Unit 5 so as to achieve and maintain a filterable PM Emission Rate no greater than 0.0150 lb/mmBtu.

          CONSENT DECREE

79.        No later than 180 Days after the Date of Entry of this Consent Decree, and continuing annually in each year thereafter, Owner Defendants shall conduct stack tests for PM at FCPP Units 4 and 5.  Alternatively, following the installation and operation of PM CEMS as required by Section VI.B of this Consent Decree, Owner Defendants may seek approval pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree to forego stack testing and instead demonstrate continuous compliance with an applicable filterable PM Emission Rate using CEMS on a 24-hour rolling average basis.

80.      Unless EPA approves a request to demonstrate continuous compliance using CEMS under the preceding Paragraph 79, to determine compliance with the PM Emission Rate established in Paragraphs 77 and 78, Owner Defendants shall use the reference methods and procedures (filterable portion only) specified in 40 C.F.R. Part 60, App. A-3, Method 5, Method 5 as described in Subpart UUUUU, Table 5, or App. A-6, Method 17 (provided that Method 17 shall only be used for stack tests conducted prior to conversion of an FCPP Unit to a Wet Stack), or alternative stack tests or methods that are requested by Owner Defendants and approved by EPA.  Each test shall consist of three separate runs performed under representative operating conditions not including periods of startup, shutdown, or Malfunction.  The sampling time for each run shall be at least 120 minutes and the volume of each run shall be at least 1.70 dry standard cubic meters (60 dry standard cubic feet).  Owner Defendants shall calculate the PM Emission Rate from the stack test results in accordance with 40 C.F.R. § 60.8(f).  The results of each PM stack test shall be submitted to EPA and NNEPA within 60 Days of completion of each test.

81.     Commencing in calendar year 2015, and continuing annually thereafter, Owner
Defendants shall conduct a PM stack test for condensable PM at FCPP Units 4 and 5, using the
reference methods and procedures set forth at 40 C.F.R. Part 51, Appendix M, Method 202 and
as set forth in Paragraph 80.  This test shall be conducted under as similar operating conditions
and as close in time as reasonably possible as the test for filterable PM in Paragraph 80.  Each
test shall consist of three separate runs performed under representative operating conditions not
including periods of startup, shutdown, or Malfunction.  The sampling time for each run shall be
at least 120 minutes and the volume of each run shall be at least 1.70 dry standard cubic meters
(60 dry standard cubic feet).  Owner Defendants shall calculate the number of pounds of
condensable PM emitted in lb/mmBtu of heat input from the stack test results in accordance with
40 C.F.R. § 60.8(f).  The results of the PM stack test conducted pursuant to this Paragraph 81
shall not be used for the purpose of determining compliance with the PM Emission Rates
required by this Consent Decree.  The results of each PM stack test shall be submitted to EPA
and the Groups within sixty (60) Days of completion of each test.  If EPA approves a request to
demonstrate continuous compliance with an applicable PM Emission Rate at a Unit using PM
CEMS under Paragraph 79, annual stack testing for condensable PM using the reference methods
and procedures set forth at 40 C.F.R. Part 51, Appendix M, Method 202 is not required for that
Unit.

82.     When Owner Defendants, through Defendant Arizona Public Service Company,
submit the application for amendment to the Title V permit for FCCP pursuant to Paragraph 151,
that application shall include a Compliance Assurance Monitoring ("CAM") plan, under 40

C.F.R. Part 64, for the PM Emission Rate in Paragraphs 77 and 78. The PM CEMS required

pursuant to Paragraph 83 may be used in that CAM plan.

### B. PM CEMS

83.         Owner Defendants shall install, correlate, maintain, and operate a PM CEMS for

FCPP Unit 4 and FCPP Unit 5 as specified below. The PM CEMS shall comprise a continuous

particle mass monitor measuring particulate matter concentration, directly or indirectly, on an

hourly average basis and a diluent monitor used to convert the concentration to units expressed

in lb/mmBtu. The PM CEMS installed at each Unit must be appropriate for the anticipated stack

conditions and capable of measuring PM concentrations on an hourly average basis. Each PM

CEMS shall complete a minimum of one cycle of operations (sampling, analyzing and data

recording) for each successive 15-minute period. Owner Defendants shall maintain, in an

electronic database, the hourly average emission values of all PM CEMS in lb/mmBtu. Except

for periods of monitor malfunction, maintenance, or repair, Owner Defendants shall continuously

operate the PM CEMS at all times when the Unit it serves is operating.

84.         By no later than nine months after the Date of Entry of this Consent Decree,

Owner Defendants shall submit to EPA for review and approval pursuant to Section XII (Review

and Approval of Submittals) of this Consent Decree a plan for the installation, correlation and

operation of the PM CEMS at FCPP Units 4 and 5.

85.         By no later than 90 Days before the installation of the PM CEMS, Owner

Defendants shall submit to EPA for review and approval pursuant to Section XII (Review and

Approval of Submittals) of this Consent Decree a proposed Quality Assurance/Quality Control

("QA/QC") protocol that shall be followed in calibrating each PM CEMS. The proposed

QA/QC protocol, subject to EPA approval, may include a process for streamlined revisions to stay current with regulatory changes (*e.g.*, PS-11) and PM monitor vendor recommendations.

86.        In developing both the plan for installation and correlation of the PM CEMS and the QA/QC protocol, Owner Defendants shall use the criteria set forth in 40 C.F.R. Part 60, Appendix B, Performance Specification 11, and Appendix F, Procedure 2. Therefore, if Owner Defendants elect to use Method 5 as described in Subpart UUUUU, Table 5 under Paragraph 80, Owner Defendants may use Method 5 as described in Subpart UUUUU, Table 5 for correlation of the PM CEMS. For each Unit at which Owner Defendants choose to install, certify, operate, and maintain a PM CEMS under 40 C.F.R. § 63.10010(i) (the Utility MATS Rule), Owner Defendants may use the correlation method specified in 40 C.F.R. § 63.10010(i) for purposes of correlating the PM CEMS under this Consent Decree. Following approval by EPA of the plan and QA/QC protocol, Owner Defendants shall thereafter operate the PM CEMS in accordance with the approved plan and protocol.

87.        By no later than 18 months after the Date of Entry of this Consent Decree, Owner Defendants shall ensure that the PM CEMS are installed, correlated, maintained and operated at FCPP Units 4 and 5. Owner Defendants shall ensure that performance specification tests on the PM CEMS are conducted, and shall ensure compliance with the PM CEMS installation plan and QA/QC protocol submitted to and approved by EPA in accordance with Paragraphs 84 and 85 is demonstrated. The PM CEMS shall be operated in accordance with the approved plan and QA/QC protocol. Pursuant to Section XI (Periodic Reporting), the data recorded by the PM CEMS during Unit operation, expressed in lb/mmBtu on a 3-hour, 24-hour, and 30-Day rolling average basis, shall be reported to EPA and the Groups in electronic format (Microsoft Excel

compatible).  Notwithstanding any other provision of this Consent Decree, exceedances of the

PM Emission Rate that occur as a result of detuning emission controls as required to achieve the

high level PM test runs during the correlation testing shall not be considered a violation of the

requirements of this Consent Decree and shall not be subject to stipulated penalties; provided,

however, that Owner Defendants shall make best efforts to keep the high level PM test runs

during such correlation testing below the applicable PM Emission Rate.

### C.    General PM Provisions

88.        For purposes of determining compliance with this Consent Decree, stack testing

pursuant to Paragraph 80 shall be the compliance method for the PM Emission Rates established

by this Consent Decree, unless EPA approves a request under Paragraph 79, in which cases PM

CEMS shall be used to demonstrate continuous compliance with an applicable PM Emission

Rate on a 24-hour rolling average basis.  Data from PM CEMS shall be used, at a minimum, to

monitor progress in reducing PM emissions on a continuous basis.

89.        Nothing in this Consent Decree is intended to, or shall alter or waive any

applicable law (including any defenses, entitlements, challenges, or clarifications related to the

Credible Evidence Rule, 40 C.F.R. § 52.12(c) (62 Fed. Reg. 8,314; Feb. 24, 1997)) concerning

the use of data for any purpose under the Act.

### VII.  PROHIBITION ON NETTING CREDITS OR OFFSETS

90.        Emission reductions that result from actions to be taken by Defendants after the

Date of Entry of this Consent Decree to comply with the requirements of this Consent Decree

shall not be considered as a creditable contemporaneous emission decrease for the purpose of

        CONSENT DECREE

obtaining a netting credit or offset under the Clean Air Act's Nonattainment NSR and PSD programs.

91.         The limitations on the generation and use of netting credits or offsets set forth in the previous Paragraph 90 do not apply to emission reductions achieved by FCPP Units that are greater than those required under this Consent Decree.  For purposes of this Paragraph, emission reductions from an FCPP Unit are greater than those required under this Consent Decree if, for example, they result from Owner Defendants' compliance with federally enforceable emission limits that are more stringent than those limits imposed on individual FCPP Units under this Consent Decree and under applicable provisions of the Act.

92.         Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by the NNEPA or EPA as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on National Ambient Air Quality Standards, PSD increment, or air quality related values, including visibility, in a Class I area.

## VIII. ENVIRONMENTAL MITIGATION PROJECTS

93.         SCE and Owner Defendants shall implement the Environmental Mitigation Projects described in Appendix A to this Consent Decree ("Projects") in compliance with the approved plans and schedules for such Projects and other terms of this Consent Decree.  SCE and Owner Defendants shall submit plans for the Projects to EPA for review and approval pursuant to Section XII (Review and Approval of Submittals) of this Consent Decree in accordance with the schedules set forth in Appendix A.  In implementing the Projects,

Defendants shall spend the amount described in Appendix A. The obligation of each Defendant to implement and finance the Projects shall be limited to each Defendant's obligation as set forth in Appendix A. SCE and Owner Defendants shall not include their own personnel costs in overseeing the implementation of the Projects as Project Dollars.

94.     SCE and Owner Defendants shall maintain, and present to EPA upon request, all documents to substantiate the Project Dollars expended on their respective Projects and shall provide these documents to EPA within thirty (30) Days of a written request.

95.     All plans and reports prepared by SCE and Owner Defendants for their respective Projects pursuant to the requirements of this Section of the Consent Decree and required to be submitted to EPA shall be publicly available from SCE and Owner Defendants, as applicable, without charge.

96.     SCE and Owner Defendants shall certify, as applicable to and as part of each plan submitted to EPA for any Project, that Defendant(s) are not otherwise required by law to perform the Project described in the plan, that Defendant(s) are unaware of any other person who is required by law to perform the Project, and that Defendant(s) will not use any Project, or portion thereof, to satisfy any obligations that it may have under other applicable requirements of law, including any applicable renewable portfolio standards or energy conservation standards.

97.     SCE and Owner Defendants shall use good faith efforts to secure as much benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

98.     If SCE or Owner Defendants elect (where such an election is allowed) to undertake a Project by contributing funds to another person or instrumentality that will carry out

- 35 -                    CONSENT DECREE

the Project in lieu of SCE or Owner Defendants, but not including SCE's or Owner Defendants'

agents or contractors, that person or instrumentality must, in writing: (a) identify its legal

authority for accepting such funding; and (b) identify its legal authority to conduct the Project for

which Defendants contribute the funds. Regardless of whether Defendants elected (where such

election is allowed) to undertake a Project by itself or to do so by contributing funds to another

person or instrumentality that will carry out the Project, Defendants acknowledge that they will

receive credit for the expenditure of such funds as Project Dollars only if Defendants

demonstrate that the funds have been actually spent by either Defendants or by the person or

instrumentality receiving them (or, in the case of internal costs, have actually been incurred by

Defendants), and that such expenditures met all requirements of this Consent Decree.

99.      Beginning six (6) months after the Date of Entry of this Consent Decree, and

continuing until completion of each Project (including any applicable periods of demonstration

or testing), SCE and Owner Defendants shall provide EPA with semi-annual updates concerning

the progress of each Project for which SCE and Owner Defendants are responsible, respectively.

100.     Within sixty (60) Days following the completion of each Project required under

this Consent Decree (including any applicable periods of demonstration or testing), SCE and

Owner Defendants, as applicable, shall submit to EPA a report that documents the date that the

Project was completed, the results from implementing the Project, including the emission

reductions or other environmental benefits achieved, and the Project Dollars expended by the

applicable Defendant(s) in implementing the Project.

# IX. CIVIL PENALTY

101.        Within thirty (30) Days after the Date of Entry of this Consent Decree,

Defendants shall pay to the United States a civil penalty in the amount of $1,500,000.  Payment

shall be made by Electronic Funds Transfer ("EFT") to the United States Department of Justice,

in accordance with current EFT procedures, referencing DOJ Case Number 90-5-2-1-10300, and

the civil action case name and case number of this action.  The costs of such EFT shall be

Defendants' responsibility.  Payment shall be made in accordance with timely instructions

provided to Defendants by the Financial Litigation Unit of the U.S. Attorney's Office for the

District of New Mexico.  Any funds received after 2:00 p.m. in the Eastern Time Zone shall be

credited on the next business day.  At the time of payment, Defendants shall provide notice of

payment, referencing the USAO File Number, the DOJ Case Number, and the civil action case

name and case number, to the Department of Justice and to EPA in accordance with Section XIX

(Notices) of this Consent Decree.

102.        Failure to timely pay the civil penalty shall subject Defendants to interest accruing

from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. §

1961, and shall render Defendants liable for all charges, costs, fees, and penalties established by

law for the benefit of a creditor or of the United States in securing payment.

103.        Upon entry of this Consent Decree, the United States shall be deemed a judgment

creditor for purposes of collection of the penalties required by this Consent Decree and

enforcement of this Consent Decree.  In any collection proceeding, the validity, amount, and

appropriateness of the civil penalty specified in this Consent Decree shall not be subject to

review.

104.    Payments made pursuant to this Section IX are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## X. RESOLUTION OF PAST CIVIL CLAIMS

105.    <u>Claims of the United States Based on Modifications Occurring Before the Date of Lodging of this Consent Decree.</u>  Entry of this Consent Decree shall resolve all civil claims of the United States against Defendants that arose from modifications that commenced at FCPP Unit 4 and Unit 5 prior to the Date of Lodging of this Consent Decree (including but not limited to those modifications alleged in the United States' Complaint filed in this civil action) under any or all of: (a) Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 to 7492, and the implementing PSD regulations; (b) Section 111 of the Clean Air Act, 42 U.S.C. § 7411 and 40 C.F.R. Section 60.14; and (c) Title V of the Clean Air Act, 42 U.S.C. §§ 7661 to 7661f, but only to the extent that such Title V claims are based on Defendants' failure to obtain an operating permit that reflects applicable requirements imposed under the NSPS provisions and Part C of Subchapter I of the Clean Air Act.

106.    <u>Claims of the Groups</u>.

(a)    Entry of this Consent Decree shall resolve all civil claims of the Groups, and the Groups hereby release all claims they made or could have made against Defendants that arose, directly or indirectly, from any modifications commenced at FCPP Unit 4 and Unit 5 prior to the Date of Lodging of this Consent Decree (including, but not limited to, those modifications alleged in the Groups' Complaint and First Amended Complaint filed in *Diné Citizens Against Ruining Our Environment, et al. v. Arizona Public Service Co., et*

*al*, Case No. 1:11-cv-00889 JB-KBM (D. N.M)) under any or all of: (a) Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 to 7492, and the implementing PSD regulations; (b) Section 111 of the Clean Air Act, 42 U.S.C. § 7411 and 40 C.F.R. Section 60.14; and (c) Title V of the Clean Air Act, 42 U.S.C. §§ 7661 to 7661f, but only to the extent that such Title V claims are based on Defendants' failure to obtain an operating permit that reflects applicable requirements imposed under Section 111 and Part C of Subchapter I of the Clean Air Act.

(b)     The Groups and Earthjustice covenant and agree not to file adverse comments on, file a petition for review under 40 C.F.R. § 124.19(a) related to, take a litigation position on, or otherwise administratively or judicially challenge in any forum the issuance of any permits or other regulatory approvals that are necessary for the construction or operation of the environmental control equipment, including, but not limited to, the SCRs and the conversion to Wet Stack at FCPP Unit 4 and Unit 5 or for any Environmental Mitigation Project identified in Appendix A, which is required by this Consent Decree. Nothing in this Paragraph shall be construed to limit the Groups' and Earthjustice's advocacy efforts related to the Clean Air Act's regional haze requirements (42 U.S.C. §§ 7491,7492) addressing the second and subsequent regional haze planning periods; provided, however, the Groups and Earthjustice shall be prohibited from raising issues related to the procurement, installation, operation, and maintenance of best available retrofit technology at FCPP during the first regional haze planning period as required by 42 U.S.C. § 7491(b)(2)(A). Any dispute regarding the Groups' compliance with this Paragraph 106 is subject to the dispute resolution provisions in Section XVI. The Groups

and Earthjustice further covenant and agree not to participate in or fund any other organization or association that seeks to oppose or challenge any such environmental control equipment or Environmental Mitigation Project in any administrative or judicial proceeding in any forum, including cost recovery proceedings before applicable state public utility commissions.  Any dispute as to this Paragraph 106 is subject to the Dispute Resolution provisions of this Consent Decree, including the written notice and right to cure provisions.  Any remedy arising from commitments of the Groups and Earthjustice pursuant to this Consent Decree is limited to equitable relief (*i.e.*, specific performance) and shall not include monetary damages.

## XI.  PERIODIC REPORTING

107.        <u>Semi-Annual Reporting</u>:  After entry of this Consent Decree, Owner Defendants shall submit to the United States and the Groups a periodic report, within 60 Days after the end of each half of the calendar year (January through June and July through December), in addition to any other express reporting requirement in this Consent Decree.  The report shall include the following information:

a.        all information necessary to determine compliance during the reporting period with the requirements of the following provisions of this Consent Decree:  Section IV concerning $NO_x$ control equipment operation, emissions, and monitoring; Section V concerning $SO_2$ control equipment operation, emissions, and monitoring, and the Surrender of $SO_2$ Allowances; and Section VI concerning PM control equipment operation, emissions, and monitoring;

CONSENT DECREE

b.      all information relating to emission Allowances and credits that Owner

        Defendants claim to have generated in accordance with Paragraph 72 through

        compliance beyond the requirements of this Consent Decree;

c.      3-hour, 24-hour, and 30-Day rolling average PM CEMS data as required by

        Paragraph 87 in electronic format (Microsoft Excel compatible), and an

        identification of all periods of monitor malfunction, maintenance, and/or repair as

        provided in Paragraph 83;

d.      all information indicating that the installation and commencement of operation of

        a pollution control device or other injunctive relief required by this Consent

        Decree may be delayed, including the nature and cause of the delay, and any steps

        taken by Owner Defendants to mitigate such delay;

e.      all affirmative defenses asserted by Owner Defendants pursuant to Section XV

        (Affirmative Defenses) for that reporting period;

f.      an identification of all periods when any pollution control device required by this

        Consent Decree to Continuously Operate was not operating, the reason(s) for the

        equipment not operating, and the basis for Owner Defendants' compliance or non-

        compliance with the Continuous Operation requirements of this Consent Decree;

        and

g.      a summary of actions implemented and expenditures made pursuant to

        implementation of the Environmental Mitigation Projects required pursuant to

        Section VIII and Appendix A.

108.     Additional Quarterly Reporting:  After entry of this Consent Decree, Defendants shall submit to the Groups a quarterly report, within 30 Days after the end of each quarter of the calendar year (January through March, April through June, July through September and October through December), providing electronic copies of the quarterly emission reports provided to the Clean Air Markets Database.

109.     In any periodic progress report submitted pursuant to this Section XI, Owner Defendants, through Defendant Arizona Public Service Company, may incorporate by reference information previously submitted pursuant to the requirements in the Title V permit for FCPP, provided that Defendant Arizona Public Service Company attaches the Title V permit report, or the relevant portion thereof, and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

110.     In addition to the progress reports required pursuant to this Section XI, if Owner Defendants violate or deviate from any provision of this Consent Decree, Owner Defendants shall submit to EPA a report on the violation or deviation within ten (10) business days after Owner Defendants knew or, by the exercise of due diligence, should have known of the event. In the report, Owner Defendants shall explain the cause or causes of the violation or deviation and any measures taken or to be taken by Owner Defendants to cure the reported violation or deviation or to prevent such violation or deviation in the future.  If at any time, the provisions of this Consent Decree are included in Title V Permits, consistent with the requirements for such inclusion in this Consent Decree, then the deviation reports required under applicable Title V regulations shall be deemed to satisfy all the requirements of this Paragraph.

111.     Each of Owner Defendants' reports shall be signed by the Vice President of Fossil

Generation for Defendant Arizona Public Service Company or his or her equivalent or designee

of at least the rank of Vice President, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the directions and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

112.     If any Allowances are Surrendered to any non-profit third party pursuant to

Paragraph 73 of this Consent Decree, the non-profit third party's certification pursuant to

Paragraph 74, shall be signed by a managing officer of the third party and shall contain the

following language:

> I certify under penalty of law that,_____ [name of third party] will not sell, trade, or otherwise exchange any of the allowances and will not use any of the allowances to meet any obligation imposed by any environmental law. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## XII.  REVIEW AND APPROVAL OF SUBMITTALS

113.     Owner Defendants or Defendants, as the case may be, shall submit each plan,

report, or other submission required by this Consent Decree to Plaintiffs whenever such a

document is required to be submitted for review or approval pursuant to this Consent Decree.

EPA may approve the submittal or decline to approve it and provide written comments

explaining the bases for declining such approval.  Within sixty (60) Days of receiving written

comments from EPA, Owner Defendants or Defendants, as the case may be, shall either: (a)

revise the submittal consistent with the written comments and provide the revised submittal to

EPA; or (b) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVI (Dispute Resolution) of this Consent Decree.

114.        Upon receipt of EPA's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, Owner Defendants or Defendants, as the case may be, shall implement the approved submittal in accordance with the schedule specified therein or another EPA-approved schedule.

## XIII.  STIPULATED PENALTIES

115.        For any failure by Owner Defendants to comply with the terms of this Consent Decree, or any failure by SCE under subparagraphs (a), (u), and (x) only to comply with the terms of this Consent Decree, and subject to the provisions of Sections XIV (Force Majeure), XV (Affirmative Defenses) and XVI (Dispute Resolution), Owner Defendants, or SCE as the case may be, shall pay, within thirty (30) Days after receipt of written demand by the EPA to Owner Defendants, or SCE as the case may be, the following stipulated penalties to the United States:

    a.        Failure to pay the civil penalty as specified in Section IX (Civil Penalty) of this Consent Decree: $10,000 per Day;

    b.        Failure to comply with the applicable 30-Day Rolling Average $NO_x$ Emission Rate, where the violation is less than 5% in excess of the lb/mmBtu limit set forth in this Consent Decree: $2,500 per Day per violation;

    c.        Failure to comply with the applicable 30-Day Rolling Average $NO_x$ Emission Rate, where the violation is equal to or greater than 5% but less than 10% in

excess of the lb/mmBtu limit set forth in this Consent Decree: $5,000 per Day per violation;

d.  Failure to comply with the applicable 30-Day Rolling Average NO$_x$ Emission Rate, where the violation is equal to or greater than 10% in excess of the lb/mmBtu limit set forth in this Consent Decree: $10,000 per Day per violation;

e.  Failure to comply with the applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraphs 79 and 80 of this Consent Decree, where the violation is less than 5% in excess of the lb/mmBtu limit set forth in this Consent Decree: $2,500 per Operating Day, starting on the Day a stack test result demonstrates a violation and continuing each Operating Day thereafter until and excluding such Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate;

f.  Failure to comply with the applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraphs 79 and 80 of this Consent Decree, where the violation is equal to or greater than 5% but less than 10% in excess of the lb/mmBtu limit set forth in this Consent Decree: $5,000 per Operating Day, starting on the Day a stack test result demonstrates a violation and continuing each Operating Day thereafter until and excluding such Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate;

g.  Failure to comply with the applicable PM Emission Rate based on the results of a stack test required pursuant to Paragraphs 79 and 80 of this Consent Decree,

CONSENT DECREE

where the violation is equal to or greater than 10% in excess of the lb/mmBtu limit set forth in this Consent Decree: $10,000 per Operating Day, starting on the Day a stack test result demonstrates a violation and continuing each Operating Day thereafter until and excluding such Day on which a subsequent stack test demonstrates compliance with the applicable PM Emission Rate;

h.     Failure to comply with the applicable 30-Day Rolling Average $SO_2$ Removal Efficiency, where the violation is less than 0.25% below the removal efficiency requirement: $2,500 per Day per violation;

i     Failure to comply with the applicable 30-Day Rolling Average $SO_2$ Removal Efficiency, where the violation is equal to or greater than 0.25% but less than 0.50% below the removal efficiency requirement: $5,000 per Day per violation;

j.     Failure to comply with the applicable 30-Day Rolling Average $SO_2$ Removal Efficiency, where the violation is equal to or greater than 0.50% below the removal efficiency requirement: $10,000 per Day per violation;

k.     Failure to comply with the applicable percent combustion concentration set forth in Paragraph 60, where the violation is less than 0.25% in excess of the combustion concentration requirement assuming all of the sulfur in the coal is converted to $SO_2$: $200 per Day per violation;

l.     Failure to comply with the applicable percent combustion concentration set forth in Paragraph 60, where the violation is equal to or greater than 0.25% but less than 0.50% in excess of the combustion concentration requirement assuming all of the sulfur in the coal is converted to $SO_2$: $400 per Day per violation;

       CONSENT DECREE

m.    Failure to comply with the applicable percent combustion concentration set forth in Paragraph 60, where the violation is equal to or greater than 0.50% in excess of the combustion concentration requirement assuming all of the sulfur in the coal is converted to $SO_2$: $800 per Day per violation;

n.    Failure to comply with an applicable $NO_x$ Annual Tonnage Limitation: $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons;

o.    Failure to comply with an applicable $SO_2$ Annual Tonnage Limitation: $5,000 per ton for first 100 tons, $10,000 per ton for each additional ton above 100 tons, plus the surrender of $SO_2$ Allowances in an amount equal to two times the number of tons of $SO_2$ emitted that exceeded the Annual Tonnage Limitation;

p.    Operation of a Unit required under this Consent Decree to be equipped with a $NO_x$ control device without the operation of such device: $10,000 per Day per violation during the first 30 Days, $37,500 per Day per violation thereafter;

q.    Failure to install and operate inlet $SO_2$ CEMS as required by Paragraph 64: $1,000 per Day per violation;

r.    Failure to conduct a stack test for PM emissions, as required in this Consent Decree: $1,000 per Day per violation;

s.    Failure to apply for any permit or Federal Implementation Plan revision, or amendment or application therefor, required by Section XVII (Title V Permit and Federal Implementation Plan Revisions): $1,000 per Day per violation;

t.    Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree:

$750 per Day per violation during the first ten Days, $1,000 per Day per violation thereafter;

u.     Failure to undertake and complete any of the Environmental Mitigation Projects in compliance with Section VIII (Environmental Mitigation Projects) of this Consent Decree: $1,000 per Day per violation during the first 30 Days, $5,000 per Day per violation thereafter;

v.     Failure to surrender $SO_2$ Allowances as required by this Consent Decree: $37,500 per Day, plus $1,000 per $SO_2$ Allowance not surrendered;

w.     Using, selling, banking, trading, or transferring $SO_2$ Allowances except as permitted by this Consent Decree: The surrender of Allowances in an amount equal to four (4) times the number of Allowances used, sold, banked, traded, or transferred in violation of this Consent Decree;

x.     Any other violation of this Consent Decree: $1,000 per Day per violation.

116.     Any violation of an applicable 30-Day Rolling Average $NO_x$ Emission Rate shall constitute thirty (30) Days of violation, but where such a violation (from the same Unit) recurs within periods less than thirty (30) Operating Days, Owner Defendants shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

117.     Any violation of the applicable 30-Day Rolling Average $SO_2$ Removal Efficiency shall constitute thirty (30) Days of violation, but where such a violation (from the same Unit) recurs within periods less than thirty (30) Operating Days, Owner Defendants shall not be

- 48 -                                        CONSENT DECREE

obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

118.        Violations of any limit based on a 365-Day rolling average constitute 365 Days of violation, but where such a violation (for the same pollutant and from the same Unit) recurs within periods less than 365 Operating Days, Owner Defendants shall not be obligated to pay a daily stipulated penalty for any Day of the recurrence for which a stipulated penalty has already been paid.

119.        Owner Defendants shall not be subject to stipulated penalties for a failure to comply with the 30-Day Rolling Average Emission Rate for $NO_x$ set forth in Paragraphs 52 and 53 due to a startup or shutdown event provided that (a) Owner Defendant's emissions do not exceed the 30-Day Rolling Average $NO_x$ Emission Rate by more than 0.010 lb/mmBtu, (b) in the next periodic reporting period, Owner Defendants provide EPA with data and calculations to demonstrate a startup or shutdown event(s) occurred and but for the startup or shutdown event, Owner Defendants would have achieved and maintained compliance with the applicable 30-Day Rolling Average Emission Rate for $NO_x$ and (c) Owner Defendants identify the time period of the event, provide EPA with data regarding the flue gas temperature entering the SCR during the startup or shutdown event, catalyst bed temperature (measured as catalyst inlet or outlet temperature), percent of flue gas or water bypassed around the economizer during the startup event (or alternatively the position of the bypass damper or valves), and fuels used during the startup event, and provide a brief description of why such startup/shutdown conditions limited or impeded the operation of the SCR.  Owner Defendants may only invoke this provision in relation to five startup or shutdown events per calendar year per Unit during the term of this Consent

CONSENT DECREE

Decree. For purposes of this Paragraph 119, a startup event is a single, continuous attempt or a series of consecutive attempts to start up without having attained 425 MW gross output. For purposes of this Paragraph 119, the startup or shutdown event may not extend more than 96 hours. This provision applies only to the calculation of stipulated penalties, and shall not be included in any permit

120.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases, whichever is applicable. Nothing in this Consent Decree shall prevent the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

121.     Owner Defendants or, as applicable, Defendants, shall pay all stipulated penalties to the United States within thirty (30) Days of receipt of written demand to Defendants from the EPA, and shall continue to make such payments every thirty (30) Days thereafter until the violation(s) no longer continues, unless Owner Defendants or Defendants, as the case may be, elect within twenty (20) Days of receipt of written demand to Defendants from the United States to dispute the obligation to pay or the accrual of stipulated penalties in accordance with the provisions in Section XVI (Dispute Resolution) of this Consent Decree.

122.     Stipulated penalties shall continue to accrue as provided in accordance with Paragraph 120 during any dispute, with interest on accrued stipulated penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.  If the dispute is resolved by agreement, or by a decision of the United States pursuant to Section XVI (Dispute Resolution) of this Consent Decree that is not appealed to the Court, accrued stipulated penalties agreed or determined to be owing, together with accrued interest, shall be paid within thirty (30) Days of the effective date of the agreement or of the receipt of the decision of the United States;

b.  If the dispute is appealed to the Court and the United States prevails in whole or in part, Owner Defendants or Defendants, as the case may be, shall, within sixty (60) Days of receipt of the Court's decision or order, pay all accrued stipulated penalties determined by the Court to be owing, together with interest accrued on such penalties determined by the Court to be owing, except as provided in Subparagraph (c) of this Paragraph 122;

c.  If the Court's decision is appealed by any Party, Owner Defendants or Defendants, as the case may be, shall, within fifteen (15) Days of receipt of the final appellate court decision, pay all accrued stipulated penalties determined by the appellate court to be owing, together with interest accrued on such stipulated penalties.

Notwithstanding any other provision of this Consent Decree, the accrued stipulated penalties agreed by the United States and Owner Defendants or Defendants, as the case may be, or determined by the United States through Dispute Resolution, to be owing may be less than the stipulated penalty amounts set forth in Paragraph 115.

CONSENT DECREE

123.     All stipulated penalties shall be paid in the manner set forth in Section IX (Civil Penalty) of this Consent Decree.  The obligations of Defendants to pay stipulated penalties under subparagraph 115(a), (u), and as applicable (x) are joint and several.  All remaining obligations to pay stipulated penalties, including as applicable subparagraph 115(x), are joint and several as to the Owner Defendants.

124.     Should Owner Defendants or Defendants, as the case may be, fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

125.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States by reason of Owner Defendants' or Defendants', as the case may be, failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of this Consent Decree (for which this Consent Decree provides for payment of a stipulated penalty) that is also a violation of the Act, including without limitation the implementing Title V operating permit program, regulations EPA has approved and/or promulgated under the Act, or of an operable Title V permit, Owner Defendants shall be allowed a credit for stipulated penalties paid against any statutory or regulatory penalties also imposed for such violation.

## XIV. FORCE MAJEURE

126.     For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Owner Defendants or Defendants, as the case may be, their contractors, or any entity controlled by Owner Defendants or Defendants, as the case may be, that delays compliance with any provision of this

Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Owner Defendants' or Defendants', as the case may be, best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using the best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay and any adverse environmental effect of the violation is minimized to the greatest extent possible.

127.　　　　<u>Notice of Force Majeure Events</u>.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Owner Defendants or Defendants, as the case may be, intend to assert a claim of Force Majeure, Owner Defendants or Defendants, as the case may be, shall notify the Plaintiffs in writing as soon as practicable, but in no event later than twenty-one (21) calendar Days following the date Owner Defendants or Defendants, as the case may be, first knew, or by the exercise of due diligence should have known, that the event caused or may cause such delay or violation.  In this notice, Owner Defendants or Defendants, as the case may be, shall reference this Paragraph 127 of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Owner Defendants or Defendants, as the case may be, to prevent or minimize the delay and any adverse environmental effect of the violation, the schedule by which Owner Defendants or Defendants, as the case may be, propose to implement those measures, and Owner Defendants' or Defendants', as the case may be, rationale for attributing a delay or violation to a Force Majeure Event.  Owner Defendants or Defendants, as the case may be, shall adopt all reasonable measures to avoid or minimize such delays or violations.  Owner Defendants or

　　　　　　　　CONSENT DECREE

Defendants, as the case may be, shall be deemed to know of any circumstance which Owner Defendants or Defendants, as the case may be, their contractors, or any entity controlled by Owner Defendants or Defendants, as the case may be, knew or should have known.

128.    Failure to Give Notice.  If Owner Defendants or Defendants, as the case may be, fail to comply with the notice requirements of this Section, the United States (after consultation with the Groups) may void Owner Defendants' or Defendants', as the case may be, claim for Force Majeure as to the specific event for which Owner Defendants or Defendants, as the case may be, have failed to comply with such notice requirement.

129.    United States' Response.  The United States shall notify Owner Defendants or Defendants, as the case may be, in writing regarding Owner Defendants' or Defendants', as the case may be, claim of Force Majeure as soon as reasonably practicable.  If the United States (after consultation with the Groups) agrees that a Force Majeure Event has delayed or prevented, or will delay or prevent, compliance with any provision of this Consent Decree, or has otherwise caused or will cause noncompliance with any provision of this Consent Decree, the United States and Owner Defendants or Defendants, as the case may be, shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement(s) by a period equal to the delay or period of noncompliance actually caused by the event.

130.    Disagreement.  If the United States (after consultation with the Groups) does not accept Owner Defendants' or Defendants', as the case may be, claim of Force Majeure, or if the United States and Owner Defendants or Defendants, as the case may be, cannot agree on the length of the delay or noncompliance actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XVI (Dispute Resolution) of this Consent Decree.

131.     Burden of Proof.  In any dispute regarding Force Majeure, Owner Defendants or Defendants, as the case may be, shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event.  Owner Defendants or Defendants, as the case may be, shall also bear the burden of proving that Owner Defendants or Defendants, as the case may be, gave the notice required by this Section XIV and the burden of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.  An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

132.     Events Excluded.  Unanticipated or increased costs or expenses associated with the performance of Owner Defendants' or Defendants', as the case may be, obligations under this Consent Decree shall not constitute a Force Majeure Event.

133.     Potential Force Majeure Events.  The Parties agree that, depending upon the circumstances related to an event and Owner Defendants' or Defendants', as the case may be, response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; unanticipated pollution control reagent delivery interruptions; acts of God; acts of war or terrorism; and orders by a government official, government agency, other regulatory authority, or a regional transmission organization, acting under and authorized by applicable law, that directs Owner Defendants to supply electricity in response to a system-wide (state-wide or regional) emergency.  Depending upon the circumstances and Owner Defendants' response to such circumstances, failure of a

permitting authority to issue a necessary permit in a timely fashion may constitute a Force

Majeure Event where the failure of the permitting authority to act is beyond the control of Owner

Defendants and Owner Defendants have taken all steps available to it to obtain the necessary

permit, including, but not limited to: submitting a complete permit application; responding to

requests for additional information by the permitting authority in a timely fashion; and accepting

lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal

terms and conditions imposed by the permitting authority.

134.　　　　As part of the resolution of any matter submitted to this Court under Section XVI

(Dispute Resolution) regarding a claim of Force Majeure, the Plaintiffs and Owner Defendants or

Defendants, as the case may be, by agreement, or this Court by order, may in appropriate

circumstances extend or modify the schedule for completion of work under this Consent Decree

to account for the delay in the work that occurred as a result of any delay agreed to by the United

States or approved by the Court.  Owner Defendants or Defendants, as the case may be, shall be

liable for stipulated penalties for their failure thereafter to complete the work in accordance with

the extended or modified schedule (provided that Owner Defendants or Defendants, as the case

may be, shall not be precluded from making a further claim of Force Majeure with regard to

meeting any such extended or modified schedule).

## XV.  AFFIRMATIVE DEFENSES

135.　　　　<u>Affirmative Defense as to Stipulated Penalties for Excess Emissions Occurring

During Malfunctions</u>.  If any FCPP Unit exceeds a unit-specific 30-Day Rolling Average

Emission Rate or 30-Day Rolling Average Removal Efficiency due to Malfunction, Owner

Defendants, bearing the burden of proof, have an affirmative defense to stipulated penalties

under this Consent Decree if Owner Defendants satisfy the conditions and reporting requirements as approved by EPA into the "Federal Implementation Plan Provisions for Four Corners Power Plant, Navajo Nation" and set forth at 40 C.F.R. § 49.5512(h)(3) (2012).

136.     To assert an affirmative defense for Malfunction under Paragraph 135, Owner Defendants shall submit all data demonstrating the actual emissions for the Day the Malfunction occurs and the 29-Day period following the Day the Malfunction occurs.  Owner Defendants may, if they elect, submit emissions data for the same 30-Day period but that excludes the excess emissions.

137.     Owner Defendants shall provide notice to the United States in writing of Owner Defendants' intent to assert an affirmative defense as to stipulated penalties for Malfunction under Paragraph 135 as soon as practicable, but in no event later than Owner Defendants' semi-annual progress reports as required by Paragraph 107.  This notice shall be submitted to EPA pursuant to the provisions of Section XIX (Notices).  The notice shall contain:

    a.    The identity of each stack or other emission point where the excess emissions occurred;

    b.    The magnitude of the excess emissions expressed in the units of the applicable emissions limitation and the operating data and calculations used in determining the magnitude of the excess emissions;

    c.    The time and duration or expected duration of the excess emissions;

    d.    The identity of the equipment from which the excess emissions emanated;

    e.    The nature and cause of the emissions;

CONSENT DECREE

f.     The steps taken, if the excess emissions were the result of a Malfunction, to remedy the Malfunction and the steps taken or planned to prevent the recurrence of the Malfunctions;

g.     The steps that were or are being taken to limit the excess emissions; and

h.     If the Title V permit for FCPP contains procedures governing source operation during periods of startup, shutdown, or Malfunction and the excess emissions resulted from startup, shutdown, or Malfunction, a list of the steps taken to comply with the permit procedures.

138.     A Malfunction shall not constitute a Force Majeure Event unless the Malfunction also meets the definition of a Force Majeure Event, as provided in Section XIV (Force Majeure).

139.     The affirmative defense provided herein is only an affirmative defense to stipulated penalties for violations of this Consent Decree, and not a defense to any civil or administrative action for injunctive relief.

## XVI.  DISPUTE RESOLUTION

140.     The dispute resolution procedure provided by this Section XVI shall be available to resolve all disputes arising under this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

141.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Party advising of a dispute pursuant to this Section XVI.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.

      CONSENT DECREE

142.     The Party receiving such a notice shall acknowledge receipt of the notice, and the Parties shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) Days following receipt of such notice.

143.     Disputes submitted to dispute resolution under this Section XVI shall, in the first instance, be the subject of informal negotiations between the Parties.  Such period of informal negotiations shall not extend beyond thirty (30) Days from the date of the first meeting between the Parties' representatives unless they agree in writing to shorten or extend this period.

144.     If the Parties are unable to reach agreement during the informal negotiation period, the United States (after consultation with the Groups) shall provide Defendants with a written summary of its position regarding the dispute.  The written position provided by the United States shall be considered binding unless, within forty-five (45) Days thereafter, Defendants seeks judicial resolution of the dispute by filing a petition with this Court.  The Plaintiffs may submit a response to the petition within forty-five (45) Days of filing.

145.     The time periods set out in this Section XVI may be shortened or lengthened upon motion to the Court of one of the Parties to the dispute, explaining the Party's basis for seeking such a scheduling modification.

146.     This Court shall not draw any inferences nor establish any presumptions adverse to either Party as a result of invocation of this Section XVI or the Parties' inability to reach agreement.

147.     As part of the resolution of any dispute under this Section XVI, in appropriate circumstances the Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for

the delay that occurred as a result of dispute resolution. Owner Defendants or Defendants, as the case may be, shall be liable for stipulated penalties for their failure thereafter to complete the work in accordance with the extended or modified schedule, provided that Owner Defendants or Defendants, as the case may be, shall not be precluded from asserting that a Force Majeure Event has caused or may cause a delay in complying with the extended or modified schedule.

148.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes. In their filings with the Court under Paragraph 144, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XVII.  TITLE V PERMIT AND FEDERAL IMPLEMENTATION PLAN REVISIONS

149.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Owner Defendants to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under applicable law, Owner Defendants shall make such application in a timely manner. EPA shall use best efforts to review expeditiously all permit applications submitted by Owner Defendants to meet the requirements of this Consent Decree. The Groups and Earthjustice covenant and agree not to file adverse comments on, file a petition for review under 40 C.F.R. § 124.19(a) related to, take a litigation position on, or otherwise administratively or judicially challenge in any forum the issuance of any permits or other regulatory approvals that are necessary for the construction or operation of the environmental control equipment, including, but not limited to, the SCRs and the conversion to Wet Stack at FCPP Unit 4 and Unit 5 or for any Environmental Mitigation Project identified in Appendix A,

which is required by this Consent Decree.  Nothing in this Paragraph shall be construed to limit the Groups' and Earthjustice's advocacy efforts related to the Clean Air Act's regional haze requirements (42 U.S.C. §§ 7491,7492) addressing the second and subsequent regional haze planning periods; provided, however, the Groups and Earthjustice shall be prohibited from raising issues related to the procurement, installation, operation, and maintenance of best available retrofit technology at FCPP during the first regional haze planning period as required by 42 U.S.C. § 7491(b)(2)(A).  Any dispute regarding the Groups' compliance with this Paragraph 149 is subject to the dispute resolution provisions in Section XVI.  The Groups and Earthjustice further covenant and agree not to participate in or fund any other organization or association that seeks to oppose or challenge any such environmental control equipment or Environmental Mitigation Project in any administrative or judicial proceeding in any forum, including cost recovery proceedings before applicable state public utility commissions.  Any dispute as to this Paragraph 149 is subject to the Dispute Resolution provisions of this Consent Decree, including the written notice and right to cure provisions.  Any remedy arising from commitments of the Groups and Earthjustice pursuant to this Consent Decree is limited to equitable relief (*i.e.*, specific performance) and shall not include monetary damages.

150.        Any failure by Owner Defendants to submit a timely permit application shall bar any use by Defendants of Section XIV (Force Majeure) of this Consent Decree, where a Force Majeure claim is based on permitting delays.

151.        Within one hundred and eighty (180) Days after the Date of Entry of this Consent Decree, Owner Defendants, through Defendant Arizona Public Service Company, shall amend any Title V permit application, or apply for modifications to the Title V permit for FCPP, to

include a schedule for implementation of all Unit-specific and plant-specific performance, operational, maintenance, control technology, and shutdown requirements established by this Consent Decree, including, but not limited to, (a) all Emission Rates and Removal Efficiencies, (b) the applicable $NO_x$ Annual Tonnage Limitations and $SO_2$ Annual Tonnage Limitations, (c) the requirements pertaining to conversion of FCPP Units 4 and 5 to Wet Stacks, (d) the requirements pertaining to the use and Surrender of $NO_x$ Allowances and $SO_2$ Allowances, (e) CEMS monitoring equipment, (f) PM optimization and annual stack test requirements, and (g) limits on use of emission credits.

152.        Within one (1) year from the Date of Entry of this Consent Decree, Owner Defendants, through Defendant Arizona Public Service Company, shall submit a written request to EPA to amend the Federal Implementation Plan ("FIP") for FCPP, as set forth at 40 C.F.R. § 49.5512, to incorporate the requirements and limitations enumerated in this Consent Decree, including but not limited to, (a) all Emission Rates and Removal Efficiencies, (b) the applicable $NO_x$ Annual Tonnage Limitations and $SO_2$ Annual Tonnage Limitations, (c) the requirements pertaining to conversion of FCPP Units 4 and 5 to Wet Stacks, (d) the requirements pertaining to the use and Surrender of $NO_x$ Allowances and $SO_2$ Allowances, (e) CEMS monitoring equipment, (f) PM optimization and annual stack test requirements, and (g) limits on use of emission credits.

153.        As soon as practicable, but in no event later than ninety (90) Days after the final amended FIP incorporating the requirements set forth in Paragraph 152 is promulgated in the Federal Register, Owner Defendants, through Defendant Arizona Public Service Company, shall

submit a complete application to the NNEPA to incorporate the requirements of the FIP, as amended, into their Title V operating permit for FCPP.

154.        Notwithstanding the reference to the Title V permit for FCPP in this Consent Decree, the enforcement of such Title V permit shall be in accordance with its own terms and the Act.  The Title V permit shall not be enforceable under this Consent Decree, although any term or limit established by or under this Consent Decree shall be enforceable under this Consent Decree regardless of whether such term has or will become part of the Title V permit, subject to the terms of Section XXVII (Termination) of this Consent Decree.

## XVIII.  INFORMATION COLLECTION AND RETENTION

155.        Any authorized representative of the United States, including its attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of FCPP at any reasonable time for the purpose of:

   a.     monitoring the progress of activities required under this Consent Decree;

   b.     verifying any data or information submitted to the United States in accordance with the terms of this Consent Decree;

   c.     obtaining samples and, upon request, splits of any samples taken by Owner Defendants or their representatives, contractors, or consultants; and

   d.     assessing Defendants' compliance with this Consent Decree.

156.        Defendants shall retain, and instruct their contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in their or their contractors' or agents' possession or control, and that directly relate to Defendants' performance of their obligations under this Consent Decree for no less than ten

years following creation of the record and/or document. This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

157.        All information and documents submitted by Defendants pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless: (a) the information and documents are subject to legal privileges or protection; or (b) Defendants claims and substantiates in accordance with 40 C.F.R. Part 2 that the information and documents contain confidential business information.

158.        Nothing in this Consent Decree shall limit the authority of the EPA to conduct tests and inspections at FCPP under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XIX.  NOTICES

159.        Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States of America:
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC  20044-7611
DJ# 90-5-2-1-10300

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

- 64 -                              CONSENT DECREE

and

Director, Enforcement Division
U.S. EPA Region 9
75 Hawthorne Street [Enf-1]
San Francisco, CA 94105
Attn: Mark Sims (Enf-2-1)

As to the Groups:

Earthjustice
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA 19103
Attn: Mary Whittle, Staff Attorney

As to Defendant Arizona Public Service Company:

Arizona Public Service Company
M.S. 9040
400 N. Fifth St.
Phoenix, AZ 85004
Attn: Vice President, Environmental & Chief Sustainability Officer

As to Defendant Southern California Edison Company:

Southern California Edison Company
2244 Walnut Grove Ave.
Rosemead, CA 91770
Attn:  General Counsel

As to Defendant El Paso Electric Company:

El Paso Electric Company
Stanton Tower
100 N. Stanton
El Paso, TX 79901
Attn: General Counsel

As to Defendant Public Service Company of New Mexico:

PNM Resources, Inc.
414 Silver Ave., S.W.
Albuquerque, NM 87102

- 65 -                    CONSENT DECREE

Attn: General Counsel & Corporate Secretary

and

PNM Resources, Inc.
414 Silver Ave., S.W.
Albuquerque, NM 87102
Attn: Executive Director of Environmental Services

As to Defendant Salt River Project Agricultural Improvement and Power District:

Salt River Project
PAB215
P.O. Box 52025
Phoenix, AZ 85072-2025
Attn: Corporate Secretary

and

Salt River Project
PAB234
P.O. Box 52025
Phoenix, AZ 85072-2025
Attn: Associate General Manager & Chief Legal Executive

As to Defendant Tucson Electric Power Company:

Tucson Electric Power Company
88 E. Broadway Blvd.
Tucson, AZ 85701
Attn: General Counsel

160.       All notifications, communications, or submissions made pursuant to this Section

XIX shall be sent either by:  (a) overnight mail or overnight delivery service with signature

required for delivery, or (b) certified or registered mail, return receipt requested.  All

notifications, communications, and transmissions (a) sent by overnight, certified, or registered

mail shall be deemed submitted on the date they are postmarked, or (b) sent by overnight

delivery service shall be deemed submitted on the date they are delivered to the delivery service.

161.        Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XX.  SALES OR TRANSFERS OF OWNERSHIP INTERESTS

162.        If an Owner Defendant proposes to sell or transfer any Ownership Interest in FCPP ("Selling Defendant") to an entity which is not an Owner Defendant ("Third-Party Purchaser"), the Selling Defendant shall advise the Third-Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the United States and EPA pursuant to Section XIX (Notices) of this Consent Decree at least sixty (60) Days before such proposed sale or transfer.

163.        No earlier than 30 days after providing the notice in Paragraph 162, the Selling Defendant may file a motion with the Court to modify this Consent Decree to make the terms and conditions of this Consent Decree applicable to the Third-Party Purchaser.  No sale or transfer of an Ownership Interest shall take place before the Third Party Purchaser and EPA have executed, and the Court has approved, a modification pursuant to Section XXIII (Modification) of this Consent Decree making the Third Party Purchaser a party to this Consent Decree and jointly and severally liable with the Selling Defendant for all the requirements of this Decree that may be applicable to the transferred or purchased Ownership Interests.

164.        This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between a Selling Defendant and any Third-Party Purchaser so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation as between a Selling Defendant and any Third-Party Purchaser

of Ownership Interests of the burdens of compliance with this Consent Decree, provided that both such Selling Defendant and such Third-Party Purchaser shall remain jointly and severally liable to EPA for the obligations of the Decree applicable to the transferred or purchased Ownership Interests.

165.            No sale or transfer of an Ownership Interest, whether in compliance with the procedures of this Section or otherwise, shall relieve a Selling Defendant of its obligation to ensure that the terms of this Consent Decree are implemented, unless (1) the transferee agrees to undertake all of the obligations required by this Consent Decree that may be applicable to the purchased or transferred Ownership Interests, and to be substituted for the Selling Defendant as a Party under the Consent Decree pursuant to Section XXIII (Modification) and thus be bound by the terms thereof, and (2) the United States consents to relieve the Selling Defendant of its obligations.  The United States may refuse to approve the substitution of the transferee for the Selling Defendant if it determines that the proposed transferee does not possess the requisite technical abilities or financial means to comply with the Consent Decree.  Notwithstanding the foregoing, however, a Selling Defendant may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections VIII (Environmental Mitigation Projects) and IX (Civil Penalty).  Defendants may propose and the United States may agree to restrict the scope of the joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the transferred or purchased Ownership Interests, to the extent such obligations may be adequately separated in an enforceable manner.

166.        Plaintiffs expressly acknowledge that an Owner Defendant may sell or transfer an Ownership Interest to another Owner Defendant, or another Owner Defendant's parent or an affiliate of the parent used by such parent for the purpose of holding such Ownership Interest ("Parent's Affiliate"), at any time and without Plaintiffs' pre-approval and without any obligation to comply with the requirements of this Section other than those set forth in this Paragraph 166.  The selling or transferring Owner Defendant shall promptly (but not later than 30 Days after such sale or transfer) notify in writing the Plaintiffs and other Defendants of such sale or transfer.  In the case of a sale or transfer by an Owner Defendant to another Owner Defendant, upon the consummation of the sale or transfer, all applicable requirements of this Consent Decree related to the Ownership Interest in the applicable Unit or Units that are being sold or transferred shall apply to the receiving Owner Defendant and all such applicable requirements shall terminate and no longer be applicable to the selling or transferring Owner Defendant, with the exception of the obligations set forth in Sections VIII (Environmental Mitigation Projects) and IX (Civil Penalty).  In the case of a sale or transfer by an Owner Defendant to another Owner Defendant's parent or Parent's Affiliate, upon the consummation of the sale or transfer, all applicable requirements of this Consent Decree related to the Ownership Interest in the applicable Unit or Units that are being sold or transferred shall apply to the Owner Defendant whose parent or Parent's Affiliate received such interest, and all such applicable requirements shall terminate and no longer be applicable to the selling or transferring Owner Defendant, with the exception of the obligations set forth in Sections VIII (Environmental Mitigation Projects) and IX (Civil Penalty); provided further that within 30 Days following the notice of sale or transfer required by this Paragraph, the Owner Defendant whose parent or

Parent's Affiliate received such interest shall deliver to the Plaintiffs an instrument signed by such Owner Defendant undertaking responsibility for all such applicable requirements. If such parent or Parent's Affiliate subsequently sells or transfers the Ownership Interest acquired pursuant to the immediately preceding sentence to a third party, such sale or transfer shall be subject to Paragraph 165.

167.     Paragraphs 162 to 163 of this Consent Decree shall not apply if an Ownership Interest is sold or transferred solely as collateral security in order to consummate a financing arrangement (not including a sale-leaseback), so long as the Owner Defendant: (a) remains the Owner or Operator (as those terms are used and interpreted under the Clean Air Act) of the subject Unit(s), (b) remains subject to and liable for all obligations and liabilities of this Consent Decree, and (c) supplies the United States with the following certification within 30 Days of the sale or transfer:

> "Certification of Change in Ownership Interest Solely for Purpose of Consummating Financing. We, the Chief Executive Officer and General Counsel of [insert name of Unit Owner], hereby jointly certify under Title 18 U.S.C. Section 1001, on our own behalf and on behalf of [insert name of Unit Owner], that any change in [insert name of Unit Owner]'s Ownership Interest in any Unit that is caused by the sale or transfer as collateral security of such Ownership Interest in such Unit(s) pursuant to the financing agreement  consummated on [insert applicable date] between [insert name of Unit Owner] and [insert applicable entity]: a) is made solely for the purpose of providing collateral security in order to consummate a financing agreement; b) does not impair [insert name of Unit Owner]'s ability, legally or otherwise, to comply timely with all terms and provisions of the Consent Decree entered in *United States v. Arizona Public Service Company, et al.*, Civil Action _____; c) does not affect [insert name of Unit Owner]'s ownership or operational control of any Unit covered by that Consent Decree in a manner that is inconsistent  with [insert name of Unit Owner]'s performance of its obligations under the Consent Decree; and d) in no way affects the status of [insert name of Unit Owner]'s obligations or liabilities under that Consent Decree."

CONSENT DECREE

## XXI.  EFFECTIVE DATE

168.         The effective date of this Consent Decree shall be the Date of Entry.

## XXII.  RETENTION OF JURISDICTION

169.         The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XXIII.  MODIFICATION

170.         The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the United States and Defendants, including, without limitation, Southern California Edison Company, except that a modification of this Consent Decree shall not require the approval and signature of Southern California Edison Company if the modification (i) does not include any modification of Section VIII (Environmental Mitigation Projects), Section IX (Civil Penalty), or Appendix A; (ii) does not otherwise affect any of the Parties' rights, obligations, or liabilities related to the Projects or civil penalty under the Consent Decree; and (iii) does not otherwise affect any of Southern California Edison Company's rights, obligations, or liabilities under the Consent Decree.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

CONSENT DECREE

## XXIV.  GENERAL PROVISIONS

171.            This Consent Decree is not a permit.  Compliance with the terms of this Consent

Decree does not guarantee compliance with all applicable federal, state, or local laws or

regulations.  The emission rates set forth herein do not relieve Owner Defendants from any

obligation to comply with other state and federal requirements under the Clean Air Act.

172.            This Consent Decree does not apply to any claim(s) of alleged criminal liability.

173.            In any subsequent administrative or judicial action initiated by the United States

for injunctive relief or civil penalties relating to the FCPP, Defendants shall not assert any

defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue

preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention

that the claims raised by the United States in the subsequent proceeding were brought, or should

have been brought, in the instant case; provided, however, that nothing in this Paragraph is

intended to affect the validity of Section X (Resolution of Past Civil Claims).

174.            Nothing in this Consent Decree shall relieve Defendants from their obligations to

comply with all applicable federal, state, and local laws and regulations, including laws,

regulations, and compliance deadlines that become applicable after the Date of Entry of the

Consent Decree.  Such laws and regulations include, but are not limited to, the Utility MACT,

the Utility NSPS requirements, and any obligation to apply for a Clean Water Act NPDES

permit(s) for the discharge of wastewater.  Nothing in this Consent Decree should be construed

to provide any relief from the emission limits or deadlines specified in such regulations,

including, but not limited to, deadlines for the installation of pollution controls required by any

such regulations, nor shall this Decree be construed as a pre-determination of eligibility for the one-year extension that may be provided under 42 U.S.C. § 7412(i)(3)(B).

175.      Subject to the provisions in Sections X (Resolution of Past Civil Claims), nothing contained in this Consent Decree shall be construed to prevent or limit the rights of the United States to obtain penalties or injunctive relief under the Act or other federal statutes, regulations, or permits.

176.      Each limit and/or other requirement established by or under this Consent Decree is a separate, independent requirement.

177.      Performance standards, emissions limits, and other quantitative standards set by or under this Consent Decree must be met to the number of significant digits in which the standard or limit is expressed. For example, an Emission Rate of 0.080 lb/mmBtu is not met if the actual Emission Rate is 0.081 lb/mmBtu. Owner Defendants shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the nearest second significant digit, depending upon whether the limit is expressed to three or two significant digits. For example, if an actual Emission Rate is 0.0704, that shall be reported as 0.070, and shall be in compliance with an Emission Rate of 0.070, and if an actual Emission Rate is 0.0705, that shall be reported as 0.071, and shall not be in compliance with an Emission Rate of 0.070. Removal Efficiency shall be rounded in the same manner. Owner Defendants shall report data to the number of significant digits in which the standard or limit is expressed.

178.      This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third parties.

179.      This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein.  No document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

180.      Unless awarded by the Court as provided below, each Party to this action shall bear its own costs and attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants. The deadline for the Groups to file a motion for costs of litigation (including attorneys' fees) for activities prior to entry of this Consent Decree by the Court is hereby extended until 30 Days after this Consent Decree is entered by the Court.  Defendants do not waive their right to oppose such motion.  An award of fees for activities prior to entry of this Consent Decree by the Court under this Paragraph does not waive the Groups' ability to seek recovery for costs of litigation (including attorneys' fees) incurred to monitor and/or enforce the provisions of this Consent Decree.

181.      The Parties expressly recognize that whenever this Consent Decree specifies that a 30-Day Rolling Average Emission Rate or a 30-Day Rolling Average Removal Efficiency shall be achieved and/or maintained commencing or starting by or no later than a certain day or date, then compliance with such Rate or Removal Efficiency shall commence immediately upon the date specified, and that compliance as of such specified date (*e.g.*, December 30) shall be

determined based on data from that date and the 29 prior Unit Operating Days (*e.g.*, December 1-29).

182.    In computing any period of time under this Consent Decree for any notification, submission or communication where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the next business day.

## XXV.  SIGNATORIES AND SERVICE

183.    Each undersigned representative of Defendants and the Groups, and the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

184.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

185.    Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

186.    Unless otherwise ordered by the Court, the Plaintiffs agree that the Defendants will not be required to file any answer or other pleading responsive to the Complaint in this matter until and unless the Court expressly declines to enter this Consent Decree, in which case Defendants shall have no less than thirty (30) Days after receiving notice of such express declination to file an answer or other pleading in response to the Complaint.

## XXVI. PUBLIC NOTICE AND COMMENT

187.        The Parties agree and acknowledge that final approval by the United States and

entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for

notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public

comment, and the right of the United States to withdraw or withhold consent if the comments

disclose facts or considerations which indicate that this Consent Decree is inappropriate,

improper, or inadequate.  Defendants and the Groups shall not oppose entry of this Consent

Decree by this Court or challenge any provision of this Consent Decree unless the United States

has notified Defendants and the Groups, in writing, that the United States no longer supports

entry of this Consent Decree.

## XXVII. TERMINATION

188.        Once Owner Defendants have:

a.        completed the requirements of Sections IV ($NO_x$ Emission Reductions and

Controls), V ($SO_2$ Emission Reductions and Controls), VI (PM Emission

Reductions and Controls), and VIII (Environmental Mitigation Projects);

b.        maintained continuous compliance with this Consent Decree, including

continuous operation of all pollution controls required by this Consent Decree, for

a period of 24 months;

c.        paid the civil penalty and any accrued stipulated penalties as required by this

Consent Decree;

d.        obtained, through Defendant Arizona Public Service Company, the final Title V

Permit for FCPP (i) as required by Section XVII (Title V Permit and Federal

CONSENT DECREE

Implementation Plan Revisions) of this Consent Decree and (ii) that includes as federally enforceable terms, all of the Unit performance and other requirements specified in this Consent Decree;

e.    certified that the date of Owner Defendants' Request for Termination is later than (i) December 31, 2023 if Owner Defendants invoke the petition process set forth in Paragraph 54, or (ii) December 31, 2021 if Owner Defendants do not invoke that process,

Owner Defendants may serve upon the Plaintiffs a Request for Termination, stating that Owner Defendants have satisfied those requirements, together with all necessary supporting documentation.

189.    Following receipt by the Plaintiffs of Owner Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether the Owner Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with the Groups, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

190.    If the United States, after consultation with the Groups, does not agree that the Decree may be terminated, Owner Defendants may invoke Dispute Resolution under Section XVI of this Decree.  However, Owner Defendants shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 141 of Section XVI, until 60 days after service of its Request for Termination or receipt of an adverse decision from the Plaintiffs, whichever is earlier.

191.     <u>Termination as to Southern California Edison</u>.  Following the successful completion of its obligations under Section VIII (Environmental Mitigation Projects) and Section IX (Civil Penalty), including all associated reporting obligations, SCE may certify these facts to the Parties and to this Court and move this Court for termination of SCE's obligations and its Party status under this Consent Decree.

## XXVIII.  FINAL JUDGMENT

192.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment.

_____
James O. Browning
United States District Judge

CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR PLAINTIFF UNITED STATES OF AMERICA:

Date: 6/23/15

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

Date: 6/23/15

JASON A. DUNN
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1111
Jason.Dunn@usdoj.gov

Date: 6/23/15

ANDREW A. SMITH
Senior Attorney
Environment & Natural Resources Division
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(505) 224-1468
andrew.smith@usdoj.gov

Date: 6/23/15

DAMON P. MARTINEZ
UNITED STATES ATTORNEY
District of New Mexico

- 79 -                                    CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: 4/6/15

Jared Blumenfeld
Regional Administrator, Region 9
United States Environmental Protection Agency

Date: 4/7/15

ALLAN ZABEL
Senior Counsel,
United States Environmental Protection Agency, Region 9

CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:


_____     Date: 6/12/15
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


_____     Date: 6/10/2015
PHILLIP A. BROOKS
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


_____     Date: May 28, 2015
SEEMA KAKADE
Attorney-Advisor, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR THE GROUPS:

Mary Whittle, Staff Attorney
Earthjustice
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA 19103
215-717-4524

- 82 -                                              CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR ARIZONA PUBLIC SERVICE COMPANY


_David A. Hansen_                     Date: 4/20/15
David A. Hansen
Vice President Fossil Generation

- 83 -                                        CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR SOUTHERN CALIFORNIA EDISON COMPANY


_____     Date: _5/29/15_
Henry Martinez
Vice President, Power Production


CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR EL PASO ELECTRIC COMPANY

Date: 15 APR 2015

Rocky R. Miracle
Senior Vice President of Corporate Development
and Planning

**APPROVED AS TO FORM**
OFFICE OF THE GENERAL COUNSEL

CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR PUBLIC SERVICE COMPANY OF NEW MEXICO

_____     Date: _4-15-15_
Chris Olson
Vice President, Generation

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT

Date: 4/9/15

Michael Hummel
Associate General Manager and
Chief Power System Executive

CONSENT DECREE

Signature page for *United States of America v. Arizona Public Service Company, et al.* Consent Decree

FOR TUCSON ELECTRIC POWER COMPANY


Date: 4/16/2015

Mark C. Mansfield
Vice President, Energy Resources

CONSENT DECREE

**APPENDIX A**

**ENVIRONMENTAL MITIGATION PROJECTS**

Defendants shall spend $6,700,000 in Project Dollars and shall comply with the requirements of this Appendix and with Section VIII (Environmental Mitigation Projects) of this Consent Decree to implement and secure the environmental and health benefits of each Project. Nothing in the Consent Decree or in this Appendix shall require SCE and Owner Defendants to spend any more than $3,216,000 and $3,484,000, respectively, in Project Dollars on Environmental Mitigation Projects.

I.     **Overall Schedule and Budget for Environmental Mitigation Projects Identified in Sections II and III of this Appendix**

A.  Within 180 Days from the Date of Entry, SCE shall submit a proposed plan (Project Plan) to EPA and the Groups for spending $3,216,000 in Project Dollars for the Wood and Coal Burning Appliances Project specified in Section II of this Appendix.  Pursuant to Section XII of the Consent Decree (Review and Approval of Submittals), EPA, after consultation with the Groups, will either approve or decline to approve the Project Plan.

B.  Within 180 Days from the Date of Entry, Owner Defendants shall submit a proposed plan (Project Plan) to EPA and the Groups for spending $1,484,000 in Project Dollars for the Weatherization Project specified in Section III of this Appendix.  Pursuant to Section XII of the Consent Decree (Review and Approval of Submittals), EPA, after consultation with the Groups, will either approve or decline to approve the Project Plan.

C.  Unless otherwise specified by this Appendix, Defendants may, at their election, spread their payments for the Environmental Mitigation Projects identified in Sections II and III of this Appendix over a five-year period commencing upon the Date of Entry. Defendants may also accelerate their payments to better effectuate a Project Plan, but Defendants shall not be entitled to any reduction in the nominal amount of the required payments by virtue of the early expenditures.

D.  All proposed Project Plans shall include the following:

1.      A plan for implementing the Project.

2.      A summary-level budget for the Project.

3.      A time line for implementation of the Project.

4.      A description of the anticipated environmental benefits of the Project including an estimate of any emission reductions or mitigation expected to be

- 1 -                                         CONSENT DECREE

realized, and the methodology and any calculations used in the derivation of such expected benefits, reductions, or mitigation.

E.  Upon approval of the Project Plan(s) required by Sections II and III of this Appendix, SCE and Owner Defendants shall complete the approved Projects for which they are responsible according to the approved Project Plan(s). Nothing in this Consent Decree shall be interpreted to prohibit Defendants from completing the Projects ahead of schedule.

F.  Nothing in this Appendix shall relieve Defendants of their obligation to comply with all applicable federal, state, and local laws and regulations.

## II.  Wood and Coal Burning Appliances Project ($3,216,000)

A.  Consistent with the requirements of Section I of this Appendix, SCE's Project Plan shall propose a plan to spend $3,216,000 in Project Dollars to sponsor a wood-burning and coal-burning appliance replacement and/or retrofit project ("WCBAR Project") that SCE shall ensure shall be implemented by (i) SCE's agents or contractors, (ii) one or more tribal air pollution control agencies, or (iii) one or more third-party non-profit organizations or entities (collectively "WCBAR Implementing Entity").  SCE's proposed choice of WCBAR Implementing Entity shall be included in the Project Plan.

B.  The WCBAR Project shall replace or retrofit inefficient, higher-polluting wood-burning or coal-burning appliances (*e.g.*, non-EPA certified wood stoves, coal stoves, and fireplaces) with cleaner-burning, more energy-efficient heating appliances (*e.g.*, Energy Star natural gas furnaces, wood pellet stoves, and gas stoves; and EPA-certified energy efficient wood stoves).  The WCBAR Project shall include installation of chimneys and stove pipes, floor and wall protection, and other measures necessary to ensure the safe and efficient use of new or retrofitted appliances.  The appliances that are replaced under the WCBAR Project shall be permanently removed from use and appropriately disposed. Installation of new, cleaner burning heating appliances shall be done by a certified or equivalent professional in conformity with all applicable manufacturers' installation instructions, state laws and local codes.  For work performed on Navajo Nation territory, all reasonable attempts shall be made to utilize vendors and installation professionals who are familiar with common heating practices and concerns unique to the Navajo Nation. All new installations shall include instruction in the appropriate use and maintenance of the appliance.

C.  The WCBAR Project shall encourage the use of the cleanest available fuels and appliances practicable, while ensuring that any replacement appliance is suitable for the fuel type that ultimately will be used in the appliance long-term.  The WCBAR Project may include pilot emission testing of wood/coal combination stoves to determine if there

CONSENT DECREE

are cleaner replacement appliances available for households using both types of fuel. Total cost of pilot testing shall not exceed 5% of the total WCBAR Project cost.

D.  The WCBAR Project shall provide incentives for the wood-burning and coal-burning appliance replacements and retrofits through rebates, vouchers, discounts, and, for income-qualified residential homeowners, full replacement costs.  A wood moisture meter shall be provided to every WCBAR Project participant that receives a new wood-burning appliance or retrofits any existing wood-burning appliance.

E.  To qualify for the WCBAR Project, the wood-burning or coal-burning appliance or fireplace must be in regular use in a primary residence or in a frequently used non-residential building (*e.g.*, churches, greenhouses, schools) during the heating season, and preference shall be given to those appliances that are a primary or significant source of heat and to households with a gross income not to exceed 150% of the Federal Poverty Guidelines.

F.  The WCBAR Project shall be implemented in the Navajo Nation territory and other areas that are in the vicinity of the Four Corners Power Plant.  In determining the specific areas to implement this project within the aforementioned geographic areas, SCE shall give priority to: (1) areas of the Navajo Nation most impacted by particulate air pollution, (2) areas that have a significant number of older and/or higher-polluting wood- or coal-burning appliances, and/or (3) areas with dense residential populations.

G.  No greater than 10% of the Project Dollars provided to the WCBAR Implementing Entity shall go towards administrative support and outreach costs associated with implementation of the WCBAR Project.

H.  Each WCBAR Project participant shall receive information related to proper operation of their new appliance and the benefits of proper operation (*e.g.*, lower emissions, better efficiency), including, if applicable, the importance of burning dry seasoned wood and the importance of using the right fuel for the appliance.  The costs associated with this element of the WCBAR Project shall not be considered part of the 10% administrative costs, and shall be marginal as compared to the total Project Dollars attributed to the WCBAR Project.

I.  SCE shall ensure that the WCBAR Implementing Entity consults with EPA's Residential Wood Smoke Reduction Team and implement the Wood Burning Appliances Project consistent with the materials available on EPA's Burn Wise (http://www.epa.gov/burnwise).

J.  SCE shall complete the WCBAR Project not later than five years after approval of the Project Plan, except that SCE may request an extension of time to complete the project if it appears likely that all Project Dollars designated under the Plan will not be spent within such five-year period despite SCE's best efforts to implement the WCBAR Project.

K.  In addition to the information required to be included in the Project completion report submitted pursuant to Section XII of this Consent Decree, SCE shall include the following information with respect to the WCBAR Project: (1) the number and type of appliances made available through the WCBAR Project, (2) the cost per unit, and (3) the value of the rebate or incentive per unit.

L.  SCE shall describe how the proposed project in the plan required to be submitted pursuant to Section I of this Appendix is consistent with the requirements of this Section and of the Consent Decree.  In that plan, SCE shall also include the following information: (1) identification of the proposed WCBAR Implementing Entity, (2) identification of any other entities with which the WCBAR Implementing Entity proposes to partner to implement the WCBAR Project (*e.g.*, the Hearth, Patio, and Barbecue Association of America, the Chimney Safety Institute of America, the American Lung Association, weatherization offices, individual stove retailers, entities that will dispose of the old appliances), (3) a description of the schedule and the budgetary increments in which SCE shall provide the Project Dollars to implement the WCBAR Project, (4) an estimate of the number and type of appliances SCE intends to subsidize or make available through the WCBAR Project, the cost per unit, and the value of the rebate or incentive per unit, (5) the criteria the WCBAR Implementing Entity will use to determine which income-qualified owners shall be eligible for full cost replacement, and (6) a description of proposed outreach to raise awareness within the geographic area of the WCBAR Project.

M.  Upon approval of the WCBAR Project Plan by EPA, SCE shall complete the Project according to the approved plan and schedule.

## III.  Weatherization Project ($1,484,000)

A.  Consistent with the requirements of Section I of this Appendix, Owner Defendants' Project Plan shall propose a plan to spend $1,484,000 in Project Dollars to sponsor a Home Weatherization Project ("HWP") that Owner Defendants shall ensure shall be implemented by (i) Owner Defendants' agents or contractors, (ii) one or more tribal air pollution control agencies, or (iii) one or more third-party non-profit organizations or entities (collectively "HWP Implementing Entity").  Owner Defendants' proposed choice of HWP Implementing Entity shall be included in the Project Plan.  The HWP shall fund home weatherization projects that reduce the use of fossil fuels and biomass.  Examples of such improvements include installation of floor, wall, and attic insulation; sealing of windows and doors; duct sealing; passive solar retrofits; and testing and repair of combustion appliances.

B.  Activities undertaken under the HWP shall adhere to the Department of Energy's Standard Work Specifications (https://sws.nrel.gov/) and shall be conducted by appropriately qualified, certified, and licensed contractors.

CONSENT DECREE

C.  The HWP shall provide weatherization services to all homes receiving heating appliance upgrades and retrofits under Section II of this Appendix A.  Weatherization services in these homes shall at a minimum include appliance testing; installation of floor, wall, and attic insulation; and sealing of windows and doors.

D.  Activities undertaken under the HWP shall adhere to the Department of Energy's Standard Work Specifications and shall be conducted by appropriately qualified, certified, and licensed contractors.  For work performed on Navajo Nation territory, all reasonable attempts shall be made to utilize vendors and installation professionals who are familiar with building practices and concerns unique to the Navajo Nation.

E.  Home energy retrofit activities have the potential to negatively affect indoor air quality if the appropriate home assessment is not made before work begins and issues that may affect indoor air quality are not identified and properly addressed.  No activity may proceed under the HWP if it will negatively impact indoor air quality or the health of the building occupants.  Contractors implementing activities under the HWP shall consult the EPA's Healthy Indoor Environment Protocols for Home Energy Upgrades (http://www.epa.gov/iaq/homes/retrofits.html) to determine actions needed to protect the health of occupants for activities occurring pursuant to the HWP.

F.  No greater than 10% of the Project Dollars provided to an HWP Implementing Entity shall go towards administrative support and outreach costs associated with implementation of the HWP Project.

G.  Owner Defendants shall complete the HWP Project not later than five years after approval of the Project Plan, except that Owner Defendants may request an extension of time to complete the project if it appears likely that all Project Dollars designated under the Plan will not be spent within such five-year period despite Owner Defendants' best efforts to implement the HWP Project.

## IV.    Health Care Project ($2,000,000)

A.  Within 180 Days from the Date of Entry, Owner Defendants shall submit a proposed medical trust instrument established under the laws of the State of New Mexico to the Groups for review and approval.  Owner Defendants shall also submit the name of a proposed bank trustee to administer the trust locally in New Mexico to the Groups for review and approval.  The Groups reserve the right to disapprove the trust instrument or trustee after review of the Owner Defendants' submission, such approval not to be unreasonably withheld or delayed.

B.  In further satisfaction of the claims of the Groups, the Health Care Project trust will be funded with $2,000,000 in Project Dollars.  The Health Care Project trust shall be set up

and completely funded by Owner Defendants within 120 days of the approval by the Groups of the trust instrument and designated trustee.

C. The Health Care Project trust shall be for the purpose of providing funds to pay for medical screening for Navajo people living in the vicinity of the Four Corners Power Plant who require respiratory health care. The funds may be used to pay for complete medical examinations, tests, review of current medications, prescriptions, oxygen tanks, and other medical equipment needed for quality of life. The funds may also be used to pay for transportation to and from the hospital or doctors' offices.

CONSENT DECREE